Original

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EVIE LITWOK
507-6 HARDING RD.
FREEHOLD, NJ 07728
PLAINTIFF

RECEIVED
DEC 11 2006
PRO SE OFFICE

vs.

DAVID MARKOWITZ
SEC
NORTHEAST REGIONAL DIVISION
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

CYNTHIA MATTHEWS
SEC
NORTHEAST REGIONAL DIVISION
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

MARK SCHOENFELD
SEC
NORTHEAST REGIONAL DIVISION
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

ANDREW GEIST
SEC
NORTHEAST REGIONAL DIVISION
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

DAVID ROSENFELD
SEC
NORTHEAST REGIONAL DIVISION
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

ALBERTO TRONCOSO
SEC
NORTHEAST REGIONAL DIVISION
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

JONATHAN CHOVLOVSKY
SEC
NORTHEAST REGIONAL CENTER
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

FRANK MOORE
SEC
NORTHEAST REGIONAL CENTER
3 WORLD FINANCIAL CENTER
NEW YORK, N.Y. 10281

CLIFFORD BROCK
C/0 AUSA JOHN MARTIN
U.S. DISTRICT COURT
EAST DISTRICT OF NEW YORK
LONG ISLAND COURT HOUSE
100 FEDERAL PLAZA
CENTRAL ISLIP, N.Y. 11722

JUDGE DORA L. IRIZARRY
U.S. DISTRICT COURT
EASTERN DISTRICT OF N.Y.
225 CADMAN PLAZA
BROOKLYN, N.Y 11201

SOL FARASH
C/O AUSA JOHN MARTIN
U.S. DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
LONG ISLAND COURTHOUSE
100 FEDERAL PLAZA
CENTRAL ISPLIP, N.Y.11722

AUSA JOHN MARTIN
U.S. DISTRICT COURT
EASTERN DISTRICT OF N.Y.
LONG ISLAND COURT HOUSE
100 FEDERAL PLAZA
CENTRAL ISLPIP, N.Y. 11722

STEPHEN KING
C/O AUSA JOHN MARTIN
U.S.DISTRICT COURT
EASTERN DISTRICT OF N.Y.
LONG ISLAND COURT HOUSE
100 FEDERAL PLAZA
CENTRAL ISLIP, N.Y.11722

H. PETER HAVELES
ARNOLD & PORTER
399 PARK AVENUE
NEW YORK, N.Y. 10022

PETER TESTAVERDE
GOLDSTEIN,GOLUB & KESSLER
1185 AVENUE OF THE AMERICAS
NEW YORK, N.Y. 10036

LEONARD LESSER
GOODWIN & PPROCTOR
599 LEXINGTON AVE
NEW YORK, N.Y. 10022

ED WELTMAN
GOODWIN & PROCTOC
599 LEXINGTON AVE
NEW YORK, N.Y. 10022

DAVID HASHMALL
GOODWIN & PROCTOC
599 LEXINGTON AVE
NEW YORK, N.Y. 10022

COREY WINOGRAD
WINOGRAD & WINOGRAD
450 7TH AVENUE
NEW YORK, N.Y. 10123

SYDNEY BERKOWITZ
C/O COREY WINOGRAD
WINOGRAD & WINOGRAD
450 7TH AVENUE
NEW YORK, N.Y. 10123

BARRY BERKOWITZ
121 SOUTH BROAD STREET
SUITE 400
PHILADELPHIA, PA 19107 DEFENDANTS,

THE NATURE OF THE ACTION

The plaintiff, Evelyn Litwok, is filing this action in the United States District Court. This action is being filed against government attorneys and staff at the Northeast Region of the Securities and Exchange Commission, IRS agents from the criminal division of the IRS, the postal inspector service, a federal Judge and non government attorneys and an accounting firm related to the on-going case.

In 1997, based on information from Postal Inspector Sol Farash, the U.S. Attorneys office filed a criminal case against Evelyn Litwok on 12/4/1997. Beginning in 1998, Jonathan Chovlovsky and Alberto Troncoso, two of the SEC attorneys, began taking investigative testimony in preparation for the filing of a civil claim against Evelyn Litwok. The SEC civil case was filed on 12/27/00. Litwok is filing an action against these government employees for violating her Constitutional rights and her right to due process during the course of these two cases.

Government employees are governed by self regulating bodies contained in their own respective offices. The self regulating bodies have not proven themselves to be effective. In the recent case of Alan Havese, the government papers "shows" surprise at the years of his systematic abuse of the system. The public, including Litwok, is not surprised. The self regulation of the government employees, government attorneys and the federal Judges has not worked. The few bad employees, attorneys and Judges have not been removed. Because of this, the public has been exposed to these people for over 30 years and it has left a bad taste our "collective" mouth.

The public spoke during the 2006 election in the only way it could by voting out the older, more incumbent Republicans. Had the Democrats been the incumbents, they would have been the ones voted out. The people being discussed in this lawsuit are "under the radar". They are the "unelected" but very "dangerous" government employees who account to no- one. The problem in this situation is the self regulation is non existent and as a defendant, this is

a real problem. Any letter a defendant writes goes to one of their peers and it goes "no further".

To make matters worse, most of these people are "tenured for life". They never lose their jobs. If they are an appointed Federal Judges, you cannot even file against them because they have so much PROTECTION.

In a recent interview Retired Judge Sandra Day O'Connor appealed for the continued separation of the branches of the government. Her manner and elegant ways are appealing. If all Judges had her abilities and temperament, perhaps the public could trust the system. With Judges being allowed to be politic appointees, favor based and above the objection of the American Bar Association (Exh.77), not all reasons for a tenured Judge make sense.

Any lawyer in New York who has been in Judge Dora L. Irizarry court room will tell you she is not capable of being civil for to long. Litwok will tell you it hardly feels like you are in the United States of America when a Judge threatens you repeatedly within one hour of talking to you. After one hour on the phone with Judge Irizarry, Litwok called to find out if she could get a protection order against a Judge. What kind of country are we in? Have we given a lunatic too much power? Doesn't anyone have the nerve to take it away from her?

This case didn't start with an independent investigation of Evelyn Litwok. It started with several branches of the United States government becoming involved in a case of Litwok's. They did so months before their independent investigation of Litwok. Their premature involvement was CRIMINAL. Each government employee who worked in the case before theirs did "covert", but not -so covert, that it was hard to find work , that implicates them in behavior that is unconstitutional and violated Litwok's rights to due process.

Had anyone at the SEC,IRS, U.S. Attorney's office been supervising or maintaining any kind of compliance over these government employees daily activities, they would have picked up their grossly illegal activities. Had the enforcement/administration departments of both the SEC and U.S. Attorney's office read complaints sent to them in 1998 and had they investigated the employees involved, Litwok might not have spent 9 years of her life defending this case.

Prior to the U.S. Attorney's involvement, the SEC involvement, the postal inspector service involvement, Litwok was the Plaintiff in an unrelated case she filed against Republic New York Securities. Litwok filed this case in April 1996.

Government employees involved themselves in this case; their involvement predated their investigation of and their involvement into any Litwok activities. This involvement was also in violation of Litwok's Constitutional rights. These SEC employees, these U.S. Attorney employees, these Postal Inspector employees, these IRS employees used their offices to work on evidence in Litwok's Republic case where the Government had **'NO INTEREST'**. These government employees used their positions to empower themselves and to insinuate themselves in a case the government had no voice and no role. Their intention was to hurt Litwok in this unrelated case in order to lay a foundation for a further case for themselves. The number of laws broken by the various agencies of the government in entering into this unrelated case are too numerous to list. The short list includes the violation Litwok's right to due process, her civil rights, Litwok's Constitutional rights, discrimination, obstruction of justice, mail fraud, international laws, fraud, perjury, misconduct,

The following are a few examples of government employee involvement with the Republic New York Securities case. These are a few of the events which compromised the Litwok v. Republic case. Incidents involving government employee violations of Litwok's civil rights will be described in full later in the text:

1. Government employees worked with Peter Haveles of Cadwalader, Haversham & Taft (counsel for Republic) helping him to contact investors from the plaintiff (Litwok's) side of the case during the trial.

2. Government employee Postal Inspector Sol Farash and others, identified for attorney Haveles, investor Catherine Lagot who was living in Thailand. Lagot was contacted in Thailand by the government employees and defense counsel and told to withdraw as a plaintiff from the Republic case. She was told by government employees about a "tape" that would be coming into the Republic arbitration proceedings three weeks before the tape had entered.

3. Haveles, who provided the tape on October 30th, the 17th session of the arbitration, stated he only received the tape the evening before.

4. The government told Ms. Lagot in mid October that Litwok had stolen money from a fund and would soon be arrested for multiple reasons.

5. The government employees contacted more than one dozen investors who were part of the case against Republic urging them to withdraw their claims.

6. Information was given to investors including but not limited to: Litwok had stolen 4 million dollars, the government would provide free subpoenas if the investors wanted to sue, please send the government letters describing how they were defrauded, and did they know they were part of a group trying to put Litwok into jail? (Litwok's case had not even begun and her presumption of innocence was not stated by the government)

7. Government employees also encouraged the investors to send letters to the New York Stock Exchange. By doing this, the government employees knew they were disrupting the proceedings, which was their intent.

8. Haveles, of Cadwalader, Wickersham & Taft, was working with Dalia Eilat, the same witness the government would use as a witness in the SEC case, the insurance fraud case, the IRS case. Eilat provided one tape which was given to an expert witness ( Exh. 25). This expert witness produced a report reflecting 23 conversations on side A marked May 16 and 21 conversations marked May 19 side B. Descriptions, including the names of people in the conversations were included in the first 9 pages of the expert report. The expert report was provided to the arbitrators on December 2 1997. The total number of conversations reported on was 44.

*****THE GOVERNMENT KNEW THEN, DURING THE ARBITRATION AND TO TODAY, THAT THERE EXISTED TWO DIFFERENT TAPES, ONE WITH 9 EXCERPTS AND ONE WITH 44 EXCERPTS... TO THIS DAY, THEY ALLOWED A NEW YORK ARBRTRATION TO BE LOST, WITH INVESTOR MONEY AT STAKE AND THEY CONTINUE TO GO AFTER LITWOK, KNOWING THEY HELPED WITH THE EDITING OF THE TWO TAPES..... THIS IS SALEM MASSACHUSETTES.... JUST A DIFFERENT WITCH HUNT ( the only person who didn't know this was the expert- Robert Brady)

9. The tape was entered into the arbitration on October 30th, the 17th session without the expert report. Haveles inferred to the arbitrators the eminent arrest of Litwok by the government. This lent credibility to the discrediting of Litwok. Letters from the investors to the arbitrators ( through the aide of government employees had also helped in the discrediting of Litwok). The arbitrators allowed both the tape and a transcript of the tape into the session with no expert report.

10. The tape offered into the October session, which was played in its entirety, contained 9 entries. The expert's tape, which was never authenticated

by the expert, but provided to the court two months later, contained 44 entries. The tape offered by Haveles was reedited and identified by Haveles as EXCERPS. The expert never saw or identified the 9 conversation tape played by Haveles to the arbitrators on October 30th.

11. This tape missing 35 conversations was marked as May 13 and May 19, not as May 16 and May 19, the dates reviewed by the expert.

12. Since the October hearing of the tape in the arbitration the U.S. attorney's office and the SEC has made this 9 conversation tape unavailable to Litwok. No one has ever made or suggested where the original 44 tape conversation is being held.

13. The SEC has the 9 conversation tape since 1997. The SEC has refused to allow Litwok to send the tape to a lab. David Markowitz has said to Litwok. You will not now nor never get this tape". The reason the SEC will not let Litwok have this 9 conversation tape is because it is not the tape the expert reviewed. It is a re edited version of a tape and it is a tape the government, with Dalia Eilat and Peter Haveles helped to create for their benefit. The expert reviewed a 44 conversation tape. The only time the tape came to be a 9 conversation tape was after it went into the hands of the government. That is why this tape has been conveniently "tucked" away for 9 years.

14. The arbitrators and staff attorney David Carey played their role too. They did not read or examine the expert report. Neither the dates nor the number of conversations match. The government influenced staff attorney David Carey. The facts and due process for Litwok were not followed by the arbitrators for the New York Stock Exchange. Had the arbitrator read the expert report, they would have seen the discrepancy and required an explanation. Certainly they would have demanded an authentication of the 9 conversation tape or thrown it out.

The arbitrators did not require Dalia Eilat to authenticate the tape and did not require the expert to authenticate the tape. They were familiar with Peter Haveles and they were getting letters from investors who were withdrawing. In accepting Haveles explanation of the situation without reviewing the expert report, the exchange and the arbitrators hurt the investing public, shirked their responsibilities and irresponsibly dismissed a case.

15. Not even a Broadway show could have been choreographed better.

16. In the face of an obvious miscarriage of justice– the tape and the expert report, which bore no resemblance to each other, the government employees, the arbitrators and Haveles were able to obstruct justice and not work for the "public interest"

17. Republic New York Securities was under investigation and closed by the SEC several years later for similar violations.

18. Litwok's "so called" fraud was now a basis of the SEC case and a beginning of their investigation.

It was not an accident that simultaneous to the end of the Republic arbitration, Litwok was arrested by Sol Farash of the Postal Inspection Service and it was not an accident that Farash was actively speaking to Republic's attorney and helping Litwok to lose the case.

It was not an accident that a Kohn investor living in Thailand, who was a Plaintiff, was contacted by the U.S. Attorney's office and encoured to withdraw from the Republic case prior to any charges being filed against Litwok by the government.

Prior to any investigation of Litwok, the government employees were violating Litwok's constitutional rights and her rights to due process by involving themselves in a case where she was a Plaintiff and actively influencing the outcome. These same government employees have, for 9 years, participated in a cover-up and conspiracy to violate Litwok's constitutional rights and have operated in a world with no rules, no supervision and where they deem themselves to be of the highest authority.

The "fake" tape which government employee David Markowitz holds under lock and key is intended to be used at trial against Litwok.

The SEC employees have failed to mention to the court, to their supervisors, or to anyone, that during the Republic sessions, the SEC, with Postal Inspector Sol Farash and Peter Haveles attorney for Republic altered the tape and offered into session 17 on October 30th a tape with only 9 conversations. This 9 conversation tape representing a tape missing 35 conversations than the "EXPERT witness reviewed".

While Haveles ranted and raved at the arbitrators about the fraud committed at the NYSE, and while Matthews Markowitz, Rosenfeld, Shoenfeld, & Co have reiterated the fraud perpetuated on the NYSE, in all their correspondence, it is

not believable that no investigatory SEC staff and so much money being spent that no one at the SEC picked up the discrepancy between the expert report on the tape and the facts reported about the tape from the October session. This evidence has been concealed or withheld to continue to violate both due process and to violate Litwok's civil rights.

This malicious prosecution, this frivolous prosecution has been perpetuated by more than just a hand full of government employees. Approximately 35 staff at the SEC alone has worked on this case.

It has been without foundation even before it was investigated. It was a "scheme" by the government and it was invented by government employees whose positions had gone to their heads.

This is not the only element of the case without foundation. The case is filled without due process. The case is filled with violation after violation of Litwok's civil rights.

These government employees have made a mockery of the system they claim to uphold and in so doing they have taken 9 years of Litwok's life, her liberty and her pursuit of happiness.

These government employees should be held accountable financially and with their jobs. Their unique positions do not allow them to violate people rights. Since 1997, the federal employees have violated the Constitutional rights of defendant Litwok. Even before filing their two cases, one criminal and civil, and their behavior in a civil case unrelated to their "matter" was blatantly a violation of Litwok's civil rights, questionably illegal, fraudulent, and unsupervised.

The government employee behavior surrounding the Plaintiff Litwok's Republic case which predated their own case and which was instrumental in helping to created their "case" against Litwok, involved actions which were criminal , violations of Litwok's civil rights and actions which should have resulted in the disbarment of attorneys. Due to the complete lack of supervision by anyone at the U.S, Attorney's Office, the Northeast Region of the SEC, the Postal Inspector Service, David Carey representing the New York Stock Exchange, unlawful actions went unchecked.

Based in part on the outcome of Plaintiff Litwok's Republic case, the SEC and the U.S. Attorney filed charges against Litwok. These charges and the course of these cases have involves the federal employees violation of Litwok's

Constitutional rights, her civil rights, due process, discrimination ( anti-Semitic, Homophobic, disabled persons), willfully committing fraud, malicious prosecution, violation of search and seizure acts. Their unconstitutional acts have taken place over a period of almost 9 years.

They violated their own code of ethics, participated in misconduct, defamation, harassment and perjury.

Throughout this 9 years process there has been no supervision or checks on the behavior of the attorneys or staff on these cases. These employees have been permitted to behave in ways "outside the law". Those in charge of them have done nothing to check on their methods. Those in charge of them have not held them accountable for their ethics, the due process used in these cases, their responsibility for the Constitutional rights of the defendant. The so called "enforcement/administrative systems of both the SEC and the U.S. Attorney were notified of egregious behior in 1998. Neither department ever contacted the defendant in writing to respond to the situation or to do follow-up over the last 8 years.

The heart of this case also lies in the actions of several accountants and non governmental attorneys whose actions remain a part of this 9 year on going investigation and case. Their actions were violations of Litwok's Constitutional rights and due process. Additionally, new information obtained through documents revealing new evidence in this case confirms the Plaintiffs suspicions of many years ago.

The positions of those in the employees working for the U.S. Attorneys office, the SEC, the IRS, the Postal Inspector offer a high degree of power. Power when unchecked cans be a dangerous instrument. In these cases, the government employees violated Litwok's most basic Constitutional rights. There are no consequences to these employees for their actions and there needs to be.

The Securities and Exchange Commission has a "Pay for Performance" system. An employee may receive increased pay depending on a supervisor's evaluation. Performance reviews are based in some part on winning cases. This pay for performance system is both a conflict or interest and a violation of the civil rights of any defendant. Has anyone in the SEC working on litigation ever gotten a raise by telling the Commission in Washington that the Defendant is a

victim? Or that a case should be withdrawn? This pay for performance encourages employees to win cases and to do so by any means.

As public servants, all these government employees must work for the good of the people and not for their own enrichment. In the 9 years Litwok has been forced to defend herself against two fraudulent claims, one with the U.S. attorney and the other with the SEC, the attorneys on the case knew their bonus pay would come as a consequence of a "win" for the SEC.

The Defendants also violated the Federal Tort Claims Act. The government is libel if a law enforcement officer commits a malicious prosecution, a false arrest, an abuse of power or for acts of omissions as employees of the government while acting within the scope of their offices and employment.

These governmental agencies are subject to liability for the negligence of these employees because the respective agencies had enforcement division, had supervisory division and did nothing to exercise substantial supervision over the day to day activities. According to the Plaintiff's reading of this Tort, the judgment of these government employees is in question. These government employees failed to act in accordance with their mandatory directives. The SEC, IRS and the U.S attorney's office all have does of conduct which were not followed by each of the defendants. The non governmental attorneys and accountants in the case, failed to follow the Professional Code.

Not less than one week after Litwok's arrest by Postal Inspector Farash a complaint was made against Postal Inspector Sol Farash. No action has ever been taken. Two years prior to the filing of an SEC case against Litwok, the administration was notified of serious violations of behavior by Jonathan Chovlovsky, the key attorney in the case, and no action was taken.

Two attorneys working for the Plaintiff sent letters to the enforcement/administrative divisions of both the SEC and the office of the U.S.Attorney. In almost nine years, there was no response from the SEC or the U.S. attorney's office about the behaviors of their employees.

Litwok is the defendant in two cases. The first case was filed December 4 1997 and the arresting officer was Postal Inspector Sol Farash. The second case filing naming Litwok as a defendant was filed by the SEC on 12/27/2000 ( primary staff was Alberto Troncoso, branch chief & Jonathan Chovlovsky). Investigation of the SEC matter started at the beginning of 1998, following the arrest by Farash.

On December 11, 1997, Tom Twomey, Plaintiff Litwok's attorney sent a letter to the U.S. Attorney's office regard the behavior of Sol Farash (Exh.1). This event occurred a week after Litwok's arrest.

Mr. Farash, representing the Federal Government falsely claimed to have a subpoena to enter Litwok's home. Farash had no subpoena. In addition, Farash interrogated Litwok for 4 hours. Mr. Twomey recommended Farash be dismissed from the employ of the government stating "his contempt for the law has done a disservice to the excellent reputation of your office". Mr. Farash not only remained on the case, but continued to violate Litwok's Positional rights for 5 additional years.

Alberto Tronsoco and Jonathan Chovlovsky of the SEC were investigating Litwok between the years of 1998 through 2000. They were involved in the investigation and participating in filing the SEC claim against Litwok. Chovlovsky attended a 341 bankruptcy hearing after telling Litwok's criminal attorney they would not be attending.

Litwok's attorney, Sean O'Shea wrote to the enforcement division of the Securities and Exchange Commission on March 31, 1998. Litwok's attorney accused Chovlovsky of violating professional ethics, Disciplinary Rule 104(a) (1) of the Code of Professional Responsibility as well as the commission's own conduct rules and policies.

Andrew Geist, ( Exh. 3) branch director, answered Mr. O'Shea's letter within 12 hours of receiving and did so without any investigation of the SEC attorney Chovlovsky. He was not from the enforcement division but chose to answer.

Geist's letter berating Litwok's attorney, showed a lack of due process, a lack of any formal investigation( nor the willingness to investigate) of the matter and a violation of Litwok's civil rights under the Constitution of the United States. Alberto Tronsoco, the Branch Chief spoke to Mr. O'Shea and O"Shea memorialized his comments ( Exh. 4).

Geist had stated in his letter, that "the Commission contacted Litwok's bankruptcy attorney prior to the hearing at which Ms. Litwok was questioned by the Commission. I am informed by Litwok's bankruptcy attorney, Michael Macco that this assertion is flatly untrue and he had no prior notice of the Commission's intentions. (Exh. 5 ) Geist, a government employee, was lying.

Troncoso, Chovlovsky and Geist had information prior to the filling of the SEC v. Litwok case in 2000 to believe their case was unwarranted. Evidence was

shown to them in person, through Litwok's attorney and through depositions taken by the SEC. In spite of very specific evidence given and available to the SEC, the SEC wrote and filed a complaint which violated Litwok's Civil rights and rights to due process because it chose to eliminate information contrary to what they wrote in their complaint.

The concept of Fairness requires the SEC to examine the breadth of evidence available. Information was available which the government employees refused to accept then and continue to refuse to accept almost 9 years later to the detriment of Litwok's life and liberty.

It is almost 9 years since Litwok's arrest. The correspondence, the minutes from court appearances contain repeated violations of Litwok's civil rights. The attorneys from the SEC and staff of the U.S. attorney's office, the IRS staff and Postal Inspector Sol Farash did much more than violate Litwok's Constitutional rights. The information contained in this claim is just a partial listing of violation. Litwok's right do due process has repeatedly been violated over the past 8 years.

The government had an obligation to have a procedure to review this case since 1997. The government employees violated their oath when working on this case. The governmental agencies they work for did no oversight or supervision. There were no compliance or review standards on these cases. Had their been a check and balance system for attorneys and government staff, information uncovered by Litwok, would certainly have been uncovered by their more professional staff. Instead of Litwok spending 9 years of her life defending against two cases, certain attorney's would be no longer practicing the "law" and certain government employees would be fired. The agencies and regulatory bodies must be held accountable for the misconduct of both their staff and their supervisory staff. Their actions are not in line with the government's guidelines for fair practice and ethical behavior.

Eight years ago, Litwok was a healthy person. As a result of this case, Litwok is medically disabled and has had "a loss of employment" and the ability to earn a living. Due to the publishing of the SEC case on the internet, every law site has referenced it and the damage to her reputation is immeasurable. As a result of SEC false and fraudulent statements, Litwok's ability to ever do business again in the financial world is unlikely. Her medical condition limits her even further (Exh. 6).

All the government agencies in this case violated Litwok's basis and fundamental Constitutional civil rights.

BACKGROUND

1. In August 1994, Litwok opened Kohn LP-1. The private placement memorandum was written by attorney Helene Netter. Netter sent out the subscription agreements and asked Investors to return signed agreements to her office.

2. Between January of 1995 and July 1995, the fund had a significant return as a result of proprietary trading used by Litwok.

3. At the beginning of April of 1995, Litwok met and hired Dalia Eilat. Eilat, an architect for 20 years, had wanted a job change.

4. Eilat sent Litwok a Fed ex containing a business plan for a company called Debut Production. Eilat wanted a million dollars for this company. Litwok said no to invest one million dollars into Debut Productions. Instead she offered the highly touted Eilat an administrative position.

5. No money ever went from Evelyn Litwok to Debut Productions and Litwok had no "interest" or position in Debut Productions. The Debut Prospectus clearly states "any body lending money would be a partner in the company". There Is no document showing any ownership by Litwok in Debut Productions.

6. Close to $700,000 dollars passed through Debut Production bank accounts during the years of 1995, 1996 and 1997. There was never a tax return given to the IRS with regard to Debut representing the $700,000 dollars in the bank accounts nor the 1099's or W-2's given to staff.

7. Eilat did get the money for Debut, but not from Litwok.

8. Litwok hired Eilat because Litwok's time spent trading had become consuming and she needed someone who knew how to run the administrative side of a business. With an "alleged" 20 years of business background, Eilat was a good candidate.

9. By May 1995, Eilat was working for Kohn LP-1 and had taken over the administrative side, including but not limited to; writing bills, meeting with accountants, preparing unemployment documents and so forth.

10. The attorneys from the SEC and those from Joe Conway's office at the U.S. Attorney were shown the transfers of money from Eilat to her companies. They

were shown transfer made in the handwriting of Eilat. Eilat has testified in various depositions that this was her hand writing ( Exh.7)

11. By 1997, Eilat had taken money from numerous sources including but not limited to: Litwok, Litwok's properties, Litwok's family properties, Kohn LP-1, Kohn LP-33. The total amount taken was in the vicinity of 4 million dollars. With only the East Hampton properties and the upcoming Republic court case for additional potential monies, Eilat needed to insure she could continue to get money from those two sources.

12. In 1997 there was not as many sources of money and Eilat changed strategies. She asked Litwok to sign a contract giving Eilat 50% of monies from the Republic case and she put up the East Hampton properties for sale.

13. In 1997, Eilat realized she had to protect the monies she stole ( $$ probably in Israel) and throw attention onto Litwok. She contacted the Postal Service, the IRS, the SEC, the U.S. Attorney's office. She organized documents in a carefully designed plan to divert attention away from her theft and implicate Litwok as the "criminal".

13. Regardless of Eilat's motivation, when Eilat went to these various regulatory bodies, it was their responsibility do to their due process. It was the regulatory responsibility to investigate Dali Eilat and see if her story was accurate. It was a violation of Litwok's civil rights to not fully investigate the charges and to presume Litwok guilty.

For Example: In a meeting in 2005 with Litwok's accountant and the Criminal Enforcement division of the IRS, Clifford Brock of the IRS and the U.S. attorney, John Martin, it was apparent the evidence the IRS presented was evidence given to them by Eilat and not evidence investigated by the IRS. Eilat had prepared specific pieces of information and those pieces were exactly what were presented to Litwok and her CPA Ted Lackowitz.

14. Until Litwok and her accountant pointed out "their" lack of information, the IRS and the U.S. attorney's office planned to claim Litwok had not paid taxes on 8 million dollars. There were roughly a dozen accounts for which general ledgers had to be created. The IRS had done none of this work. These accounts had to have credit and debit sheets tied to each other. The IRS did not have this either. There was no way to know what monies came or went from any account without the general ledger and the balance sheets which were only created by Litwok's accountant. The IRS was operating off a few documents

given to them by Eilat. This was admitted to Litwok and her accountant during these meetings.

15. 8 years after Litwok's arrest, the IRS and the U.S. Attorney's office still listed a 2 million dollar math error shown to them three years earlier on April 9, 2002. This is a violation of due process and Litwok's civil rights.

16. The cases delivered to the U.S. attorney, the IRS and the SEC were organized and marked by Eilat. Eilat gave the government one limited view of what happened to fit into a case she prepared for them. The government took Eilat's documents and never did their due diligence. The government did no investigation. By doing no investigation and forcing a case to "fit" the information they had, the government violated their own standards and the Constitution. Litwok was never presumed innocent. Litwok was always presumed guilty and expected to plead "guilty". In 8 years of trying to get the governments attention on this case, Litwok has had no chance of showing the evidence to the government staff.

17. The exception was when Litwok's attorney Sapone "suspiciously" quit in 2004. Litwok asked to speak to the U.S. attorney's office with the "explicit hope" of having the government withdraw the case.

18. Litwok believed if the government saw the evidence from her CPA, Ted Lackowitz, and the government's case would be withdrawn. Ted Lackowitz is the only person who examined to all the accounts and all the account backup checks.

19. Litwok and John Martin, the AUSA from the U.S. attorney's office agreed to meet with the IRS at Mr. Lackowitz's office. The agreement also contained the proviso that AUSA Martin would provide Litwok with three things: Debut Production tax returns. Verification of whether Eilat had filed her 1995,96,97,98 taxes and a meeting to go over Eilat's "perjured testimony".

20. The first two meetings went on as planned with Lackowtiz providing a detailed analysis of why there was no 8 million dollar problem. Lackowitz went through the general ledger and balance sheet with the agents. The 8 million dollar government case shrunk quickly to being a case of whether taxes were paid on the East Hampton homes and who owned the homes.

21. John Martin called Litwok at home to discuss the case. It should have come as a surprise but it did... when Martin told Litwok while he realizes "he doesn't have the case he did before" BUT he could still prosecute me for the

purchase of the East Hampton property in 1995". Ausa Martin decided to "change" the case instead of withdrawing it. "I can still bring a case against you for the East Hampton homes".." It will be your word against Eilat's and we think we can turn her into a good witness".

22. Litwok pointed out to Mr. Martin the homes were in Eilat's name at the end of 1995. Martin claimed Eilat would say, the houses were really Litwok's ( throughout this case, the various government employees involved in the case used the houses differently- when it was convenient for Eilat to be the owner, she was, when it was convenient for Litwok to be the owner, they used that). Martin believed he could turn "Eilat into a good witness and the case would be her word against mine".

23. Litwok realized she had given information that would be used against her. Litwok would not be defending against an 8 million dollar case, which had she not provided the U.S. attorney, she might have won because the IRS and the U.S. attorney's office never did an independent analysis and their case would have fallen apart. Additionally, because the IRS and the U.S. Attorney's office did not due process and a fair review, for 8 years, they never knew the facts about the numbers until told so by Litwok's accountants. They violated Litwok's Constitutional rights by keeping this case open without ever pursuing the correct evidence or correcting the evidence they knew to be false.

24. Clifford Brock is and was the IRS agent working on this case since 1997. At the April 9, 2002 arraignment, Brock told Litwok and Litwok attorney O'Shea about the 8 million dollar tax problem. Knowing the information was incorrect, Litwok asked and was given the document showing the 8 million dollars. It took less than 5 minutes for Litwok to "spot a 2 million" dollar math error. The IRS did not correctly compute expired options. They incorrectly added in 2 million dollars on a single transaction.

25. Ted Lackowitz was faxed the document and confirmed the 2 million dollar error. He told them there were additional math errors from the expired options.

26. Even though Clifford Brock acknowledged this error, it was still listed 3 years later at the meeting with AUSA Martin. Brock had never revisited the question of math errors from expired options. This added millions to the IRS tax case. No supervisor at the IRS ever checked on Brocks work. It was and is a violation of Litwok's Constitutional rights to claim criminal charges based on

"mathematical errors". It is a continued violation to not drop the charges once knowing the tax case in question in no more than a series of math errors.

27. Later in 2002, Stephen King was the AUSA for the U.S. attorney's office. Litwok's attorney Sapone and Litwok went to a meeting with Stephen King, Clifford Brock, and several others. The meeting took place in a room which was the size of a closet. It was designed to make Litwok uncomfortable.

28. The IRS attempted to present the 8 million dollar case but they couldn't explain the 8 million dollars. Litwok provided the details and explained most of the money. The IRS referred to a block of $400,000 as Litwok's money. For example, Eilat had told them Litwok received $400,000. Litwok was supposed to have received it on paper but it ended up in an account controlled by Eilat (Eilat had only shown them the "supposed to documents and the IRS never bothered to investigate the matter, they didn't due their due diligence). Litwok explained which account it went into and in fact, Litwok did not receive the $400,000.

29. From their notes, Litwok could see it was Eilat's presentation being read back to her. The IRS and the U.S. Attorney's office had never checked these accounts or where the money went. This meeting took place in November of 2002. In spite of Litwok's obvious knowledge about the money and the obvious lack of knowledge by the IRS and the U.S. Attorney's office, Stephen King turned to Litwok and said, "I can see you are not going to take a plea, just know Ms. Litwok, I will have you in jail by Christmas" ( This conversation took place in November-- in spite of the governments lack of knowledge of their evidence, they also lacked concern that their evidence was incorrect). His harassment and threatening comments were designed to get a plea and not the truth. Mr. King's obligation was to due process and to get at the truth. He was obligated not to violate Litwok's civil rights. Instead, his goal was to threaten and intimidate Litwok into a plea based on a poor foundation of evidence and a clear disinterest in getting any.

30. It made no difference to these government employees whether they had the correct facts. There was no FAIRNESS here. They were only interested in a conviction. They made no effort over 8 years to investigate the matter to determine if they had the correct facts.

31. In the 2005 meetings, Litwok offered documented information because the AUSA assured Litwok that if the information being provided was accurate,

AUSA Martin would consider withdrawing. Martin, after the meetings, told Litwok he had no intention of withdrawing. But he thanked Litwok for clearing up a few matters.

32. Martin also never had the meeting about Eilat and "the box" of information prepared for the U.S. Attorneys office. Martin stated to Litwok, he did have Eilat as a witness and could still go forward with his case.

33. Litwok met Eilat in April 1995 and Eilat started working for Kohn LP-1 in May 1995. On May 9, 1995, Eilat wired $100,000 to her company Debut Productions (Exh. 8). In April 1995 through July 1995, Eilat withdrew money from her own brokerage account to her personal and business accounts roughly one million dollars, the money came from trading profits from her brokerage accounts. This is a partial listing of the amounts withdrawn : $49,066.33, $500,000, $15,000, $50,000, $85,000 ( used to pay off the mortgage on her New York apartment), $249,000, $120,000 (Exh.7)

34. These amounts came from trading profits and were reported on Eilat's 1995 tax return as part of a 2 million capital gain. By not looking at Eilat's tax return and the cash flow from her to herself, the concept of due process failed to exist. These amounts also reflect a portion of the "alleged" factual claim the SEC makes against Litwok which is a lie the SEC is attempting to cover-up. They state Litwok transferred 1.3 million to Eilat. This never happened. Eilat transferred 1.3 million from herself to herself. All money transfers were part of profits from a trading account and had nothing to do with any investor funds. In making this lie as part of their case in chief the SEC violating too many laws too mention. It's outrageous and what is more outrageous is the behavior of David Markowitz and Cynthia Matthews who have come to believe their own lies. As they would say, the documents speak for themselves. Why is no one at the SEC reeling these two loose cannons in? There is no evidence to support the "1.3 million dollar" allegation. Eilat's wire transfers were not only pure profit but reported as capitol gains by Eilat herself. How is it possible that an entire institution ( the SEC) is covering up for each other?

35. Cynthia Matthews and David Markowitz of the SEC fought with Judge Lindsay over "not taking" deposition of Theodore Haag, Eilat's accountant, calling it irrelevant. The SEC attorneys had their case and did not want Eilat or Eilat's accountant investigated. If this is not a failure of due process, what is?

36. The SEC attorneys have and are vehemently fighting to keep Eilat's wire transfers out of the case. It appears that no supervisor at the SEC reads the minutes or letters of the specific cases. The money trail in this case is easy to follow. There is no money in Litwok's accounts. There is money in Eilat's accounts. There has always been money in Eilat's accounts. It does not take a rocket scientist to figure out who had and who took the money. The government employee did no investigation.

37. The government attorneys and staff have put two variations on how to interpret the fact that Eilat has all the money. The first prevailing theme is Litwok and Eilat were lovers and Litwok transferred the money to her. This doesn't work for two reasons, Litwok was not involved in the transfer of money. Litwok did not benefit from the money being transferred into Eilat's separate businesses. The government employees went to a lot of trouble inventing stories which were not plausible.

38. The second reason which was actually Eilat's stated reason for going to the authorities, was Eilat felt guilty she was involved in fraud. .. so guilty she had to get a cooperation agreement with the authorities and testify against Litwok. As time goes on, neither of these theories look plausible. Litwok gained nothing in either scenario.

39. The IRS was negligent in not looking or not considering Eilat's money transfers and her tax returns. The IRS, the U.S. attorney and the SEC did not investigate and were not interested in prosecuting Eilat. Eilat had handed them Litwok. GOOD OR BAD CASE, THEY ALL WERE DETERMINED TO PROSECUTE LITWOK.

40. Around the same time as Eilat was hired and began to withdraw funds, Litwok started having problems with her broker dealer –Republic New York Securities. Around May 19, 1995, Litwok's broker dealer had intentionally traded a million contracts of Intel's deep in the money options incorrectly. A week before the trade, Republic New York Securities called Litwok to ask if they could execute her trade one way. Litwok said no. Over her objection and contrary to her written instructions, Republic New York Securities did what they wanted to do.

41. Instead of selling Litwok's deep in the money options, Republic exercised the options, putting 100 million, ( when the fund was worth 20 million) into the

funds brokerage account. This overnight transaction was a violation of Securities law.

42. On April 16, 1996, Litwok filed suit against Republic New York Securities on behalf of the general partner of Kohn LP-1 and its limited partners.

43. On April 10, 1996, just prior to the claim being filed, Eilat asked Litwok to sign a contract for Eilat to receive a large portion of everything Litwok owned. This was one of many contracts Litwok was asked to sign.

44. Eilat had been presented to Litwok as someone who was successful for 20 years. Litwok only found out too late, that Eilat's business was not good ( Exh. 9). Eilat barely earned $10,000-12,000 in 1993 and 1994 according to her tax returns.

45. Eilat had tax liens from years earlier, owed substantial monies and sent herself 100,000 in May 1995( Exh. 10). This money was used to pay off credit card bills, dentists, and all kinds of bills ranging from 2 - 6 years old.

46. Litwok refused to sign the agreement presented to her by Eilat. Eilat wrote agreements from the moment she met Litwok.

47. By her own admission in several depositions, Eilat got a mortgage for Litwok for her homes because Litwok was not credit worthy and Eilat had excellent credit. Litwok paid cash for the properties in East Hampton and could not understand why she couldn't get a home equity type of loan. Eilat insisted Litwok had bad credit and the only way to get the money out of the property was through Eilat. Eilat assured Litwok the title would be in Eilat's name only while obtaining the mortgage and the title would return to Litwok's name after the financing occurred.

48. Litwok had only rented apartments her entire life and had no experience with mortgages. Litwok assumed Eilat was telling her the truth.

49. It is not clear which financings represent Litwok's actual signature or the computer generated signature Eilat admitted to using. Eilat took care ot the financings and refinancing of properties and Litwok's computer generated signature was used when Eilat needed it ( and without Litwok's knowledge) Matthews and Markowitz of the SEC have heard direct testimony by Eilat where she stated, she used the computer generated signature. It should have been a big red flag for the SEC.

50. Between 1995 and 1997, Eilat systematically moved the money she took through her two business accounts, DE & A and Debut Productions. Money

being transferred out of Kohn accounts or Litwok accounts was for the sole benefit of Eilat's business. Litwok had no access to either DE & A bank accounts or Debut Production bank accounts.

51. One of the funds the SEC falsely accuses Litwok of both owning and misappropriated money (in the first two pages of the SEC complaint) from was Kohn LP-33. This fund was in fact owned by Eilat. With the exception of one document, all documents verify Eilat's ownership ( Exh. 11).

In the May 2005 deposition of Litwok's accountant, Ted Lackowitz, Cynthia Matthews thoroughly went through the Kohn LP 33 trading documents with Lackowitz. It was clear to Matthews as of that deposition that all investor money was invested and lost in trading. Matthews, the SEC government attorney, completed understood no investor money was taken from Kohn LP - 33. Regardless of whose fund it was, the investments were used and lost in trading. The SEC continues to use the work "misappropriation" in relation to Litwok and continues to attribute the "33" fund to Litwok.

In addition, the "expense" payments, used by Eilat for Eilat ( Exh. 11A), primary to pay her credit cards and mortgages seem to be of little concern to the SEC. Neither Eilat's clear authority to move money and her actual moving of the money to herself for herself never prevented the SEC from sticking to to their "policy of non due process" for Litwok.

In addition to the documents, roughly all 300 checks were written by Eilat. The account was expense money for the general partner and Eilat used the expense money to pay her personal credit cards and bills for her personal companies. The SEC was told this repeatedly and ignored all written checks, all information contrary to their limited theory of the case. They were focused on prosecuting Litwok only. By limiting the scope of their investigating and closing the door to any other interpretation, they violated Litwok's Constitutional rights. The SEC did not care the Eilat used Kohn LP 33 for 2 years to pay for her NY apartment, , her NY rent , her credit cards and her utility bills for her other businesses.

52. Eilat's long time partner of 10 years, Sarah Kane, stated in her deposition, Eilat had to take money from Kohn 33 to pay DE & A because it was the only place that had money.( Exh. 12) Not even the testimony of Eilat's closet person was investigated by the SEC or any other government employee. Sarah Kane who received money frequently from Eilat was never questioned.

53. By early 1997, there was no money in Kohn LP- 1, the East Hampton properties had been financed and refinanced and the quarterly expense money from Kohn LP-33 had been used up by Eilat.

54. The only place left for Eilat to take money from was the Republic New York Securities case. Litwok had not signed the April 10. 1996 agreement giving Dalia Eilat money from Litwok's share of the Republic case.

55. On March 1997, Eilat came to the 24 Duke Drive house where Litwok was staying. Litwok had guests staying there when Eilat came by. Eilat had yet another agreement (Exh. 13). This agreement gave Eilat 50% of the monies from the Republic case.

56. When Litwok refused to sign the agreement, Eilat threatened Litwok she would ruin the case and destroy Litwok's life. The actual threats were heard by two witnesses.

57. One of the witnesses, Adrienne Moore, testified before Alberto Troncoso and Jonathan Chovlovsky, SEC attorney's, on January 8, 1999 ( Exh.14 ).

58. Alberto Troncoso was the branch chief at the Northeast Region of the SEC who had previously spoken with Litwok's attorney and knew of Chovlovsky's unethical behavior prior to this deposition.

59. Moore testified to Troncoso and Chovlovsky about the March 1997 confrontation between Eilat and Litwok. She stated "Dalia had pulled up the driveway. We ran upstairs because we - I never really had too many meetings with her. Evie went to the front door and we cranked open the window at the front. We were listening to her. She was like "If you don't sign this paper and give me half of everything, I'm going to see that you lose everything. I'm going to make sure your face is in the mud"..."The way she was going at Evie was- it even scared me. She said she would do anything in her power to hurt her, to hurt Evelyn". Moore and her friend heard what Eilat said to Litwok in March 1997. Troncoso and Chovlovsky of the SEC heard this testimony.

60. Moore's friend, Sherry Friedman, stated "You should be careful for your life. This girl might try and hurt you too." Neither Adrienne Moore nor Sherry Friedman has been asked to be a witness. None of the government employees investigated their testimony. Their testimony gives MOTIVE to Dalia Eilat. Eilat's motive was to destroy the Republic case and destroy Litwok. Her actions in 1997 have been well documented but not used by any of these agencies- SEC, IRS and the U.S. Attorney's office.

61. Moore goes on to say on P.43 "she , Dalia was always following us".."when threats started happenening , and Evie had to call a private investigator to put up a little camera to catch them doing what they do, I was frightened" "Dalia and Sarah were scaring us in the middle of the night".

62. Moore's testimony to Tronsoco and Chovlovsky of the SEC contained repeated comments regarding the "dangerous" relationship between Litwok and Eilat in 1996 and 1997.

63. Moore stated she and Litwok were live in lovers in 1996 and 1997. The SEC attorneys hearing this testimony, in 1998, also helped to write the SEC filing against Litwok on December 27,2000.

---

LESBIAN LOVERS?

64. In the SEC compliant ( Exh.15) under the heading of NATURE OF THE COMPLAINT, the SEC states 'Litwok misappropriated 3 million dollars, of which approximately $1.3 million went to Litwok's live in companion, Eilat" The SEC knew both these statements to be false and still maintain theirs to be a 'factual" case.

65. Regarding the $1.3 million dollars allegedly transferred from Litwok to Eilat. This is blatantly false and fraud. Exhibit 6 & 7 show monies being transferred. These monies were from profits from Eilat's brokerage accounts. With the exception of the May 9, 1995 transfer, the monies were Eilat's and she transferred them to herself. It is not a coincidence that the 1.3 million dollar figure described in the complaint is almost the same monies took out by Eilat for herself to herself.

66. In spite of repeated testimony contrary to the SEC claim, this allegation remains part of the case. The SEC in recent conversations with Judge Irizarry still claims their factual case to be indisputable.

67. Describing Eilat as Litwok's lover is a lie. The SEC knew this before they wrote the claim from the testimony of Litwok's live in companion Moore. They also knew from the testimony of Sarah Kane that Eilat was living with Kane in 1995. In spite of knowing these "material facts", they SEC materially lied in its writing its description of the relationship between Eilat and Litwok. Matthews and Markowitz are fully aware of it. On Page 4, under relief defendant, it states

"During 1995 and 1996, Eilat was Litwok's live in companion, lived in Litwok's house in East Hampton.

68. Adrienne Moore testified to the SEC about living with Litwok in 1996. Troncoso and Chovlovsky heard this and chose to put the "lesbian lover" mention in the complaint. They lied at the time they wrote the compliant knowing they were lying.

69. By putting this fraudulent statement into the complaint, the SEC had hoped to use the "lesbian angle" to help their case. Their Homophobic bias is obvious. They believed a jury hearing Litwok was a lesbian would work to their advantage even if the facts were not true. They violated Litwok's Constitutional rights.

70. Prior to the filing of the complaint, Eilat had testified numerous times and in numerous court rooms. The SEC knew "AT NO TIME DID EILAT LIVE AT LITWOK'S HOUSE. EILAT LIVED IN NEW YORK CITY ' at the apartment she paid off 4 weeks after meeting Litwok. Mark Schoenfeld, Alberto Troncoso, Jonathan Chovlovsky, David Rosenfeld and Frank Moore all heard testimony regarding the relationship of Eilat and Litwok and still chose to portray it as "a lesbian lover" relationship in spite of evidence to the contrary.

71. Matthews and Markowitz of the SEC were in a deposition with Eilat in July 2004. Eilat was asked when she stopped liking Litwok. Eilat's answer "the day after I met her". This was the truth. Matthews and Markowitz laughed but not for the right reasons. More importantly, they did nothing to change the SEC claim and their theory of the case.

72. Litwok is a lesbian. Eilat is involved with men and women.

73. Unlike the SEC "fantasy lesbian lover/partner claim", Litwok and Eilat intensely disliked each other. Not only was there no "lesbian live in lover relationship" but early in 1995, there was a hostile relationship between the two.

74. In addition, Eilat was living with Sarah Kane in 1995 when the SEC claims Eilat was "Litwok's live in companion". Litwok told the various government employees about the relationship between Eilat and Kane, but no one questioned Kane. In fact, Kane worked closely with Eilat to remove and get Litwok and Kohn assets. The SEC, IRS and the U.S. Attorney's office did no investigation about this.

75. Sarah Kane's bank accounts are not in line with her tax returns. Eilat gave Kane "cash" which went unreported. All those working on these two cases did not investigate the relationship between Kane, Eilat and the transferred money.

76. Moore testified to Tronsoco and Chovlovsky ( Exh. 14 ) "they ( Eilat and Litwok) were always fighting on the phone". This didn't prevent the SEC from characterizing the Litwok Eilat relationship as a lesbian relationship.

77. THE LESBAIN LOVER ELEMENT IS KEY TO THE SEC CASE, WITHOUT IT, THE ENTIRE CASE MAKES NO SENSE.

78. The SEC violated Litwok's right when attempting to appeal to its Homophobia ( Red State) value. They used this to help this case in spite of its harm to Litwok.

79. The SEC needed the Lesbian element because NO JUDGE OR JURY would believe than less than 3 weeks after meeting Eilat ( a stranger ), Litwok would give a total stranger everything she worked for 20 years. In order to make their claim work, the SEC committed fraud when they described Litwok and Eilat as Lesbian lovers. Their misconduct, their discriminatory action has to be dealt with by the Court.

80. Eilat was an employee of Kohn. Eilat received checks which she sent from herself to herself.

81. If the SEC submitted a claim saying an employee of Kohn stole Litwok's money, most jurors and Judges would wonder if the employee did the stealing. There would be little explanation for Litwok "allegedly" giving an employee 1.3 million. Even for an employee of the month, this would be too much.

82. In order for the transferring of the money to make sense, the SEC had to file a deceitful claim alleging the lovers gave money to each other. Now that works! ( even though it is a lie - the SEC is willing to live with).

83. Without the "lesbian lover" relationship, the SEC could not explain large portions of money Eilat transferred to herself. They could misdirect, omit and lie since the lover explanation gave them an umbrella to frame their case under.

84. The 1.3 million dollars which the SEC falsely attributed to Litwok, was all signed and transferred by Eilat to Eilat. Her authentication of the signatures was sworn to under oath. Litwok is and was not a signatory in the bank accounts of Debut Production and DE & A.

85. For over 8 days of depositions, including several with the SEC, Eilat had "different explanations" for the money transfers. In one deposition, she claims

she was being paid money for Debut Productions, in another deposition, she claimed she and Litwok were hiding the money and more recently she stated ( after denying she transferred any money), "she only did what Litwok told her to do". The SEC employees, the IRS, the U.S. attorney have all these depositions. Litwok's questions about the transferred are repeated in every deposition. A simple cross referencing of the depositions will show a different answer for a different day.

86. Why didn't the SEC stop the fraud? Why didn't the SEC conceal the truth and violate Litwok's life? The answer might be in a policy called Pay for Performance. SEC staff is entitled to a bonus is they get a good recommendation from a litigation. There is no bonus for lost cases. This is a conflict of interest because it compels the SEC to win regardless of the guilt or innocence of a defendant. The SEC pay policy is in violation to its ethical code. When you have an innocent defendant, you can be ethical or you can make your bonus. It's not a good policy and this too is a violation of a defendants Civil Rights.

---

EILATS PLAN TO BRING DOWN LITWOK AND THE REPUBLIC CASE

87. In 1997, there was little money available for Eilat. Once Litwok refused to file the March 1997 ( Exh. 13) contract, Eilat went to work on a plan to destroy Litwok and the Republic case.

88. During session 17 of the Republic case, Peter Haveles, attorney for Republic, stated to the arbitrators, that "beginning in February 1997, Eilat began a practice of taping Litwok's phone calls. Eilat was taping Litwok on a daily basis.

89. Tapes brought into the Republic case were dated May 13 and May 19 according to Haveles.

90. Assuming Eilat was taping Litwok every day, there would have been at least one tape a day and over a 4 month period, there would have to be some 720 tapes.

91. Eilat's office was housed in one large room with her and Sarah Kane working by her side. In Kane's deposition, Kane is asked if she saw tapes, Kane said no. When asked if Kane helped in the taping, Kane said no. When asked if

Kane saw the tape recorder or heard the clicking of an "on" and "off" tape recorder, Kane said no.

92. The government agencies involved in this case never investigated Kane, the office, any other tapes or the situation. In fact David Markowitz of the SEC has been the single most adamant person regarding the "one" tape. He told Litwok, "there is no way you will ever get the original copy of the tape". There is a reason for the Markowitz comment. It goes to a cover up and it goes to trampling on Litwok's civil rights.

93. Eilat was taping Litwok between February and May of 1997 according to Haveles.

94. The only other asset still available was the East Hampton properties. On May 19, 1997, Eilat signed papers to put the homes up for sale ( Exh.16). Eilat contacted appraisers to get the value of the house ( Exh.17). Eilat could not have been on the phone taping Litwok while in East Hampton signing papers. At no time, did the government employees use the "for sale" sign in their case. The government never mentioned it is hard even for Eilat to be in two places at the same time. This evidence was concealed. This evidence would contradict the government case so it was set aside.

95. The testimony of Peter Haveles on behalf of Eilat at the arbitration including the presentation of the tapes dated May 13 and May 19, 1997 ( Exh. 18).

96. The SEC has gone over the transcripts and documents with Litwok at Litwok's deposition and in Eilat's deposition. The SEC has used the tape and the tape transcript in this case.

97. On May 19, 1997, when Eilat was "allegedly" physically having conversations with Litwok from Eilat's New York office to Litwok's East Hampton home, Eilat was in East Hampton signing documents to put up the homes for sale.

98. This was not investigated by the SEC or the U.S. attorney's office. This was investigated by Litwok. The real estate office confirmed for Litwok the homes were put up for sale in person by Eilat on May 19,1997.

99. Was it the obligation of the SEC to check out the facts? Litwok had told these facts to everyone from Mark Schoenfeld to Joe Conway of the U.S. Attorney's office.

100. Eilat has claimed ownership of the houses in multiple court rooms and letters. The IRS, in spite of Eilat's sworn testimony that Eilat was the owner of the houses, still continues to persecute and prosecute Litwok about the homes in the tax case.

101. In May 1997, Litwok saw the "For Sale" signs up and went to see Eilat. Eilat and her partner OF TEN YEARS, Sarah Kane, both filed criminal complaints against Litwok for trespassing and harassment. They also filed for an order of protection against Litwok

101. By May 1997, Eilat was taping Litwok, trying to sell the houses and working on a scheme to have Litwok arrested for insurance fraud.

102. By May 1997, Eilat was working with Postal Inspector Sol Farash and others preparing to "give" them Litwok.

103. There had been a flood in the Aborigine house in October of 1996. Eilat hired two adjusters, Adrienne Moore and Joan Villazon, to prepare the claim for Chubb ( Exh.19).

104. Eilat prepared the numbers with the adjusters and sent the claim into Chubb. In November, a pipe burst at the Duke Drive house and Dalia worked with the same adjusters to file a second claim.

105. Chubb started to send checks for the insurance claim in February of 1997. The checks were made out to Dalia Eilat as the homes and insurance were in her name. Eilat was corresponding with Chubb starting February of 1997 through fall of 1997. The government has all the correspondence between Eilat and Chubb. The government is aware that Eilat knew when each and every check was sent to her. The government was and is aware Eilat knew when each and every insurance check was deposited. The government is also aware that Eilat never used the word "forgery" regarding checks deposited in February until October of 1997 the exact time she provided the "alleged" Litwok tape for the Republic case. This was also the exact time Eilat contacted the IRS and the SEC. Didn't anyone at the government find it a little suspicious that Eilat, whose bank accounts had more than 4 million dollars between the years of 1995 through 1997 was coming to the government to report Litwok who had no history of any criminal record? Did the government look into Litwok's past or Eilat's past? Why didn't Eilat, who had been in constant contact with Chubb, fail to mention the "forged" checks 6 months earlier?

106. Between February of 1997 through the fall the taping of Litwok with regard to the Republic case was "allegedly " going on, and the correspondence with Chubb with a future insurance fraud case was being worked on by Eilat ( Exh.20)

107. The East Hampton homes, which Eilat wanted to sell , were not going to be available for sale. Tom Twomey, Litwok's attorney, had a Lis P put on the homes and filed a lawsuit against Eilat (Exh. 21 )

108. In Eilat's response to the lawsuit (Exh.22), she claimed to be the sole owner of the homes since 1995. This public lawsuit, filed in Riverhead was provided to the IRS, the U.S. attorney and the SEC. In it, Eilat claims ownership for much more than the homes. This document has never been used in the tax or SEC case. If used, it would contradict the government's case.

109. By the summer of 1997, Eilat was working closely with Sol Farash, the IRS, the U.S. Attorney's office and SEC attorneys.

110. Through their "coordinated efforts", a plan was put in place. The government employees worked with Eilat to make several things happen: 1) prepare the tape for the October 30th arbitration session ( and the subsequent implosion of the Republic case; 2) contact investors to let them know about "Litwok" and 3) set into motion a false arrest for insurance fraud. The goal was to use the impending but false insurance fraud case, the tape from Eilat and the defamation and destruction of Litwok's reputation to investors in order to accomplish Eilat's first goal, the destruction of the Kohn case against Republic.

********************************

THE REPUBLIC CASE AND THE TAPE

111. The 17th session of the arbitration was scheduled for October 30, 1997. Eilat worked with Peter Haveles (Cadwalader, Wickersham & Taft), Republics attorney, Sol Farash Postal inspector, David Carey of the NYSE, and together these parties called the individual investors who were the plaintiff's in the case.

112. Katherine Lagot, an investor living in THAILAND, was contacted in mid October. Katherine Lagot and Debbie Delman were Litwok's friends for 14 years. Lagot was contacted by Postal Inspector Sol Farash and told they, the government, were bringing down Litwok. Peter Haveles gave instructions for Lagot through her attorney Stuart Smith. Lagot was told to withdraw for the case or she would be faced with paying the legal fees of Haveles and Cadwalader, Wickersham & Taft. The government by contacting this investor is

clearly violating at least Litwok's Constitutional rights if not a dozen more illegal activities.

113. Lagot was informed the SEC, via Jonathan Chovlovsky may be contacting her. Government employees told Lagot of Litwok's eminent arrest and civil action by the SEC. Government employees acting with the Defendants attorney in the Republic case obstructed justice by calling Lagot and other investors. The government had NO INTEREST in this case and acting at all in this matter violated Litwok's rights. Calling an investor in another country was just another violation.

114. By mid October, Haveles Eilat and the government had what they wanted, Lagot's withdrawal from the claim. It was signed at the American Consulate in Thailand ( Exh. 23).

115. The government had filed no charges against Litwok In October 1997. The government had no business being involved in the Republic arbitration.

116. By Eilat's own admission through Peter Haveles ( Cadwalader, Wickersham & Taft), she began taping conversations with Litwok in February 1997 (Exh. 18, p.1708,L 7). This coincides with Litwok's refusal to sign the Eilat contract.

117. The key to the plan was a tape. The key to the tape was to have two tapes; one to play to the arbitrators and one to give to the expert. The experts tape would only be seen by the expert and the arbitrators tape would only be heard one time at the arbitration.

****this plan could only work if no one noticed the following****

The tape brought into the October arbitration contained 9 conversations.

**The tape examined by the expert contained 44 conversations.**

Neither Dalia Eilat nor the expert could authenticate because that would constitute fraud and endanger the careers of Haveles and the government employees. For this plan to work the two tapes had to exist separately and that is exactly what happened.

*****Haveles falsely testified under oath, "the tape was provided to us by Eilat's attorney yesterday afternoon ( Exh. 18/P.1699) The tape which "alleges" conversations happening in on May 13 and May 19,1997, was given to the SEC and the U.S. Attorney in mid October at ahead of the October 30th session of the arbitration.

118. On October 30, Haveles entered the tape and a transcript of the tape into evidence. Over the very serious objections of Litwok's attorney, and resulting consequences, the arbitrators allowed the tape to be heard and the transcript to be let in.

119. David Carey representing the New York Stock Exchange sat in on the session. Neither Carey representing the NYSE, nor the arbitrators, allowed for a review of the tape by Litwok or her attorney.

120. Haveles confronted Litwok's attorney Leonard Lesser ( Schneck, Weltman & Hashmall) and threatened to have him disbarred if he proceeded with the case. Lesser and his firm withdrew from the case later that day.

121. Haveles was from a large firm and had the backing of the government on this matter. Lesser was told that he and his firm would be in jeopardy if they continued to help Litwok. Lesser and his firm left Litwok with no attorney and no way of defending against Haveles.

122. Haveles, representing the defendant Republic, told the arbitrators Litwok is being investigated for insurance fraud and SEC civil violations. He violated her civil rights because this information should not have been allowed to come into this arbitration. Haveles perpetuated a fraud on the stock exchange and by doing so, he hurt the "investing public". Haveles also prejudiced Litwok.

123. Peter Haveles and Sol Farash were in touch with investors from Kohn LP-1 who were the Plaintiff's in the case as early as October 1997.

124. The original tape went to the U.S. Attorney but ended up with David Markowitz of the SEC. To this day, the original copy of the 9 conversation tape is in the hands of government employees at the SEC.

125. Litwok's attorney's Schneck Weltman Hashmall left the case following the threats from Haveles about bringing their firm in front of the Bar associations.

126. Prior to the 17th session, October 30, the case had been going well. The arbitrators were concerned about the May 1995 error where Republic deposited 100,000,000 million dollars into the Kohn accounts.

127. The only way to fight the tape was to have a copy. Litwok was denied due process. The U.S. Attorney, the SEC and Haveles did not give Litwok the original tape. The case should have been adjourned until Litwok had a copy to verify. There was a reason Litwok could not get a copy of the tape and the reason would be made apparent on December 2 session of the arbitration.

128. Litwok had a designated laboratory and tape expert willing to work on the tape, and despite numerous letters to the arbitrators, Haveles and the government, Litwok could not get the tape (Exh. 24).

129. All Litwok could do was provide an analysis without the tape. The arbitrators had made up their minds. Haveles had convinced the arbitrators that Litwok, a bad person, committed fraud on the New York Stock Exchange.

130. The truth is that Haveles, Eilat and the government employees perpetuated a fraud on the New York Stock Exchange.

131. There are reasons why the "tape" provided by Eilat were not then and will never be given to Litwok. David Markowitz will never let Litwok have the tape to examine.

132. This is part of a "cover-up", the concealment and conspiracy which is controlled by the Northeast region government employee, the U.S., attorney's office, the IRS, Halves and Eilat.

133. According to Haveles, (Exh. 18/P.1708), "the tape is conversations between Eilat and Litwok. Page 1722, Haveles refers to the tape portions as EXCERPS of the 9 conversation from May 13 and May 19. "The first conversation s Is from May 13. I will indicate when they are for May 19". Haveles provided, and the arbitrators let in a transcription of what has been referred to as EXCERPS.

134. During the December 2 session, Haveles presented an expert's report on the "tape". The experts did not come in to authenticate his report and was not at the meeting when the tape of 9 conversations was played. The expert never knew that the tape he reviewed was not the same tape as the tape Haveles played for the arbitration panel.

Haveles perpetuated a fraud on the panel by offering one tape in October and concealing the fact that a completely different tape( a second tape) was reviewed by the expert. The expert would have no know of knowing this. The arbitrator should have known and would have known this if they had read the notes from the October session and the first nine pages of the expert report. Even a cursory review of those two sessions should have caused an adjournment of this case. The arbitrators and David Carey disregarded their responsibilities. Len Lesser and his firm could have but did not read the two sessions. If they had, they too would have caught this obvious discrepancy.

Instead, Haveles pointed to the conclusion of the expert testimony where Robert Brady said the "tape" was authentic.

135. Haveles claimed to have left out a few conversations because "the preponderance of them contains conversations of a dramatically more personal nature between Eilat and Litwok. David Carey and the arbitrators should have asked if the tape was re-edited by Haveles to eliminate some conversations. David Carey and the arbitrators should have understood that "Haveles" was using EXCERPS-THIS SHOULD HAVE BEEN A RED FLAG.

136. Litwok was stunned Haveles would be permitted to edit any part of the tape. The arbitrators did not react to the editing of the tape.

137. Haveles lied to the arbitrators when he said a few conversations were eliminated. David Carey and the arbitrators of the New York Stock Exchange had either not read the expert report or were in collusion with Haveles and Cadwalader, Wickersham & Taft.

138. The tape presented at the October meeting had 9 phone calls. The transcript reflected only these nine phone calls.

**139. The expert witness report ( Exh. 25) describes side one of the tape as having 21 phone calls and side two of the tape as having 23 phone calls.** The panel and the NYSE received 9 of 44 phone calls.

140. Haveles perpetuated a fraud on the stock exchange and a fraud on the investors of the fund.

141. The tape he entered into evidence was not the tape the expert examined. Haveles re-edited the tape and eliminated 35 phone calls.

142, Haveles perjured himself when he stated a "number of phone conversations that we did not play to the panel. The preponderance of them contained conversations of a dramatically more personal nature between Eilat and Litwok ( as if even that was appropriate).

143. Haveles used the term "Litwok has perpetuated a fraud on the stock exchange" (more than 12 times in the October session) to tell the arbitrators that he removed 35 phone calls.

144. The arbitrators did not allow for due process for this arbitration. The arbitrators were influenced by government employees waiting to arrest Litwok December 4th, in two days. The arbitrators and the exchange did not read the report. If they had, they would have noticed 35 missing phone calls. Because

Litwok was arrested two days later, she could not continue to fight to get a copy of the tape. Her constitutional rights were being violated by all parties.

145. This tape has not been made available to Litwok because the arbitration of the Republic case was "a huge miscarriage of justice". Haveles, David Carey, the arbitrators and the NYSE should be held accountable for the deception.

146. The statements made by Haveles concerning Litwok are defamatory. Haveles willingly perpetuated a fraud in the arbitration. He spoke to investors who were plaintiffs while he was defendants counsel.

He obstructed justice and substituted the real tape with an edited version.

147. The New York Stock Exchange had two months to pick up on the problem with the tape. The arbitrators and David Carey are experienced. There is no excuse for their behavior. There is also no excuse for the behavior of Schneck Weltman who, in fear of Haveles, left their client, rather than read the documents. Their negligence resulted in the loss of the case of legal fees of 2 million dollars assessed to Litwok and Litwok's family. In addition, if Haveles switching of the tapes had been revealed or if Schneck Weltman Hashmall brought in the expert, the arbitrators would have discovered the Haveles fraud. This would have led to a judgment in favor of the Plaintiff's. Schneck Weltman Hashmall should have picked up the tape problem as quickly as Litwok did. Instead of running with their tails between their legs, they would have won a half a billion dollar case.

148. The "conspiracy" involved the SEC employees and the U.S. attorney employees. David Markowitz is still holding onto this tape for fear the conspiracy will be uncovered.

149. Not only was no one paying attention at the New York Stock Exchange about the missing 75% of the tape, the tape examined by Robert Brady did not reflect the dates of May 13 and May 19 as stated by Haveles. The tape examined by Brady was marked May 16 and May 19. Phone calls from May 13 were non existent.

150. Haveles needed to re-edit the tape so that it would be May 13 and May 19. To authenticate the events he had to change the date of the tape. David Carey and the arbitrators did not pick up on the different dates of the tapes.

151. David Carey, the arbitrators and the NYSE let a fraud on them cause a case to be dismissed. The arbitrators representing the New York Stock Exchange did a disservice to the investors of Kohn LP - 1.

152. Haveles stated additional phone calls not brought to the attention of the panel were between Eilat and Litwok. In fact, the expert report refers to phone calls with a Mike Jasco, Andy, Lou Licamelli, Roseann. Lynn and others. Haveles lied.

153. Haveles and the New York Stock Exchange violated Litwok's civil rights and her right to due process. By perpetuating a fraud with an edited tape while supplying an expert report which doesn't resemble the tape heard, Haveles broke the law, his oath, all ethical standards and much more. In order to win his case, Haveles ruined the lives of Litwok, her investors and the "investing public". He prevented a good claim against Republic from moving forward through misconduct and fraud. He was helped by government employees.

154. The "tape" given to arbitrators was not authenticated by the expert. Haveles could not bring in the expert because the expert did not examine the 9 call tape, on the wrong dates.

155. Haveles didn't bring Dalia Eilat into the court room for the same reason. Eilat would have had to authenticate the wrong tape and the government did not want their chief witness to be exposed.

160. During October and November of 1997, Sol Farash played a significant role in the demise of the Republic case. Farash helped "alter" Eilat's tapes for the arbitration session. Farash contacted Kohn clients and falsely accused Litwok of stealing money. Farash also defamed Litwok's character. Farash willingly contacted the investors for the sole purpose of helping Eilat and furthering a false criminal case.

161. Farash used his position as a government employee in an abusive, unethical, and illegal fashion. In doing what he did, Farash also violated Litwok's civil rights.

162. Sol Farash contacted investors of both funds, Kohn Lp-1 which was owned by Litwok and Kohn LP-33 which was owned by Eilat. Farash had no right in his capacity to interfere with the Republic case. He violated a host of laws.

163. Sol Farash told investors the following:

1) Litwok took 4 million dollars from Kohn 33 ( Kohn 33 had approximately 2 million )

2) Litwok was going to be arrested for an insurance scheme

3) A group of people wee organizing to sue Litwok

4) Encouraged the investors to send letters to Haveles, the NYSE and the government about individual complaints about Litwok ( this was a great help to Haveles)

164. Jerry Smalley, an investor was someone who spoke to Sol Farash. Exh. 26 refer to the conversation Farash had with Smalley.

165. The government employees had a vested interest in Litwok losing the Republic case. Haveles had the benefit of Sol Farash on going communication with the investors.

166. Jerry Smalley, an investor, was working with Farash directly. Smalley was also in touch with Lagot, an investor who was in THAILAND, and her attorney Stuart Smith.

167. Eilat and Farash contacted Lagot in Thailand to instruct her and her attorney on "how to withdraw" from the Republic case. Lagot signed the withdrawal prior to the 17th session. Haveles received Eilat's and Lagot's withdrawal prior to the session.

168. Prior to Litwok's December 4th arrest, Farash was still in contact with investors asking them to keep sending more letters describing "How we were defrauded"(Exh. 27).

169. At the direction of Farash, Jerry Smalley and others sent letters to the SEC, the U.S. Attorneys office, Peter Haveles, the NYSE. Farash encourage them to get other investors involved. Farash helped to organize the clients into a group to sue Litwok. He called all the clients and purposely put words and thoughts in their minds. He gave each investor the same story. Farash manipulated the situation by providing investors with the "same story". Farash violated Litwok's write of due process and her civil rights.

170. As part of the plan, Jerry Smalley wrote to the New York Stock Exchange asking the arbitrators to allow the limited partners to be represented. This undermined Litwok even further. This letter was sent to David Carey and the arbitrators prior to the December session ( Exh. 28).

171. The arbitrators were seeing the Plaintiff side of the case fall apart as the investor's letters began to come in to the exchange.

172. At the advice of Farash, investors were repeatedly asked to each write "a letter and tell how we were defrauded as well as documenting our transfer of funds to LP -1".

173. Haveles, Farash, Eilat helped to erode the investor support for the Republic case. They were being told Litwok was a criminal.

174. Smalley tells investors the same thing Farash told investors, Litwok stole 4 million dollars ( Exh. 29). All this false information, this misconduct, this violation of due process was carried out by Farash and other government employees.

175. Farash told investors Litwok stole 4 million from Kohn 33 when Kohn 33 only had 2 million. Farash committed perjury and lied about the theft. This false and misleading information was part of the larger conspiracy to have Litwok put away. Farash had a relationship with Eilat and he was committed to helping her because of their relationship.

176. Farash acted ferrousily in his protection of Eilat and in his desire to Jail Litwok.

177. On January 22, 1998, Postal Inspector Farash was still working with Kohn LP-1 and Kohn LP-33 investors. He "indicted that he would issue any subpoenas that the group wanted"... which will be free of charge". Farash "again requested that each of us writes a letter to him describing how we were defrauded (Exh.30)". Offering free subpoenas to the Kohn investors was a violation of Litwok's Constitutional rights.

178. Farash met with and spoke to many of the investors. During the course of taking depositions in case 00-CV-7627, the SEC v. Litwok and Eilat (who was later dropped), deposed clients confirmed the contact with Sol Farash.

179. Dennis DeAngelo was contacted by Jerry Smalley and told about Sol Farash ( Exh. 24). DeAngelo was deposed by Cynthia Matthews of the SEC on May 30, 2003. Matthews and Markowitz of the SEC were fully aware of the actions of the U.S Attorneys government employees and attempted to prohibit testimony regarding their behavior during the depositions.

180. When DeAngelo was asked "what did Farash tell you?". DeAngelo stated "I honestly don't even remember what the purpose of his call was other than just to possibly inform me that there were other things going on with Evelyn ( Exh. 31).

181. Farash told DeAngelo that "you were part of a group of people who lost money". "It was obvious he was contacting people who were involved with LP-1.. and he was just informing us of other issues that were in the process with Ms. Litwok".

182. Depositions in the SEC v. Litwok and Eilat, taken by the SEC were directed to those clients already contacted by Postal Inspector Sol Farash including Janet Davis, Jerry Smalley, Gary Glascow, Gordon Allen, Dennis DeAngelo, etc. Farash willfully, intentionally and falsely informed these investors of Litwok's undeniable guilt.

183. Sol Farash was not the only government employee who committed fraud, misrepresented the facts and committed perjury. IRS investigator Clifford Brock was part of the scheme and the conspiracy to help both the office of the U.S. Attorney and the Northeast Region of the SEC conspire to build a false case against Litwok.

184. Clifford Brock, the IRS investigator, was shown millions of dollars of math mistakes on the part of the IRS and "forgot" to correct them,

185. Clifford Brock went to pick up documents from Dennis DeAngelo without a subpoena. In fact, the documents Clifford Brock picked up were for the SEC. Why is an IRS investigator picking up documents for the SEC?

186. Clifford Brock went to DeAngelo to get documents in 1997. DeAngelo had never received a subpoena from the IRS for his documents. DeAngelo stated he had only one copy of the documents and these documents were in the possession of Matthews and Markowitz of the SEC at the time of the DeAngelo deposition. Clifford Brock, the IRS investigator, gave the DeAngelo documents to the SEC.

187. DeAngelo state "Clifford Brock walking in the door of my store. I don't know how he knew about me, I do know the reason why he walked in the door as opposed to contacting me in some manner. He explained that he was in the area because he owns a summer home in Southampton and he was there so he walked in the door, identified himself and asked for the documents" (Exh. 32/P.117)

188. The set of documents given to Clifford Brock was the only copy of those documents DeAngelo maintained. The documents he gave Brock were the same documents used during his deposition taken by Cynthia Matthews of the Northeast Region of the SEC. Brock were directly working with the SEC.

189. A title search company in the Hamptons provided Litwok with a title search for Clifford Brock. The Title search company found no home owned by Clifford Brock in the time period of 1995 through 1999. IRS investigator Clifford Brock lied to DeAngelo when he told him, he lived in the area.

190. Farash and Brock played a large role in helping to destroy the Republic case and to destroy Litwok's credibility with the investors.

OTHER ISSUES MAKING THE EILAT TAPE IMPLAUSIBLE - WHICH THE GOVERNMENT DID NOT INVESTIGATE OR CHOSE TO IGNORE

191. The tape authenticated by Robery Brady was not the tape submitted as evidence Into the arbitration. The "tape" was edited and conversations "making Litwok look guilty" was made available to the court.

192. There are several reasons the "tape" was not made available to Litwok. The first and most obvious was because it was edited to be what the government, Haveles, Republic and Eilat wanted it to be.

193. The second reason is that Eilat did not tape Litwok on a daily basis. The office is small and Sarah Kane would have noticed hundreds of tapes.

194. Eilat did not use the "Radio Shack" piece of equipment to tape the original phone calls. The radio shack tape recorder submitted to Brady is the type of machine which required a button be depressed to record.

195. This button makes a noise when it is pressed on and when it is pressed off. Hundreds of phone calls came into the DE & A office as exhibited by their phone bills. Sarah Kane testified to never hearing the machine be turned on and off.

196. Since Sarah Kane is heard answering the phone for a few of the 9 conversations, the tape recording device would have had to be on without her knowing it or Kane is lying.

EILAT HAS $300,00 WORTH OF EDITING EQUIPMENT - DESIGNED TO MAKE A TAPE SUCH AS THE ONE SHE MADE

197. Eilat was hired to purchase computer equipment for Kohn LP-1 from the soft dollar account. Litwok, who to this day, is computer challenged, knew nothing about computers. Litwok wanted to simulate her proprietary trading on the computer. Litwok wanted Eilat to purchase computers and help to set up a simulation model.

198. Eilat did buy the computers and explained to Litwok it would be easier to set this up at the Aborigine house. Eilat intended to bring out the necessary software people who could simulate the trading.

199. It was permissible to use the soft dollar account to purchase equipment, research or anything to improve trading.

200. Litwok allowed Eilat to do the purchasing. The equipment was set up at the Aborigine house. Eilat did not purchase equipment for Kohn to simulate trading. Eilat bought equipment for Debut Productions. She was not authorized to buy equipment for Debut through Kohn LP-1.

201. In April 1996, Eilat and Kane rented a van and stole the equipment from the Aborigine house and put it in her New York offices.

202. A computer made by SGI was purchased by Eilat. The call phrase for the SGI in 1995 was -"it brings fake things to life" (Exh. 33). This machine was used by George Lukas, the film director to make Star Wars. It is designed for editing.

203. Dalia Eilat probably did tape Litwok on the SGI and edited the words. Since only an analogue exam was done on the tape, there is no way to know the original source of the tape. Pat Colgan, a Private Investigator working for Litwok, took affidavits from people who work for Analogue tapes ( like the radio shack tape) and ones working with digital ( like the SGI Eilat had in her office). His affidavit ( Exh. 34) states, it is impossible to determine alteration if done by a digital medium.

LITWOK DID KEEP A LOG BOOK AND DIARY BY HER COMPUTER

204. Finally, the tape concerns Litwok's diary and a log book which she kept at her desk. Liz McDonough, Litwok's assistant in 1995 stated in her deposition, she had seen the diary and the log at Litwok's desk. The SEC heard that same testimony. This was contrary to what was stated in the 9 conversation tape.

205. Litwok's attorney Lesser, Schneck, Weltman & Hashmall, failed to speak up about the interview they had with Litwok's father. Litwok's father authenticated the existence of the diaries and the logs. This was contrary to what was stated in the 9 conversation tape.

206. As soon as the Fed ex package containing the diaries and log were sent by Litwok's father to Schneck Weltman Hashmall, Litwok's father was asked to authenticate what he had sent.

207. Since Litwok's father helped her with spread sheets, he knew what he had sent and told it to the attorneys. Litwok's father verified he sent the diary

and logs to the attorney's. The attorneys, more fearful of Haveles and their license, violated Litwok's due process by not telling the arbitrators of their meeting with Litwok's father. Litwok's attorney's had knowledge the "tape" was false and chose to protect themselves instead of bringing forth a witness– Litwok's father.

208. Litwok's and Kohn's attorneys abrupt withdrawal caused damage to the case, the loss of the case and damages Litwok's family who were sued by Republic for legal fees and Litwok's subsequent arrest and civil cases.

209. The government employees blocked the investigation of the tape and the investigation of all matters relating to the tape. No follow up was done on questioning of Litwok's assistant about her having seen the log and diaries at Litwok's desk. NO follow– up or investigation was done about the fed– ex package sent by Litwok's father to attorneys' Schneck Weltman & Hashmall.

210. In spite of the lack of due process, the re-edited non authenticated tape continues to be used in Litwok's prosecution. In Litwok's own deposition, Matthews questioned Litwok for over six hours from the tape transcription. Matthews went through the transcripts line by line. The very government employees who participated in the editing of the tape were now using the same tape to impeach Litwok.

211. During the December 16, 2004 meeting between Judge Lindsay, the SEC ( M & M) and Litwok, there was a discussion of the tape. This was prior to the taking of Litwok's deposition (Exh.35). On Page 31, Litwok asks the Court to intervene and get a copy of the tape.

212. The Court asked Matthews and Markowitz whether they planned on using the tape in the deposition. M & M has two trademark responses; 1) attack, lie, misrepresent, reiterate the charges against Litwok or the other response;2) avoid, fold, or say I don't know. The discrepancy between the two responses is alarming.

213. Matthews response to the Judge Lindsay in response to "do you plan on using the tapes?" was "Litwok fabricated documents for the proceeding". The Judge stated " maybe I didn't make myself clear, I asked you are you going to use this tape in the trail? Mathews- "we may, we may". THE GOVERNMENT PLANNED ON USING TAPE "9" AT ALL TIMES BUT REFUSES TO TELL THE COURT.

214. Matthews continued" "I don't know that I've said = I said we may use. I think the reason I use that language is because you never know exactly what's

going to happen, but I would expect to use it ( this is the SEC avoid type answer).

215. Roughly a page later reminds the court what's in the tape and why she "may" use it. Matthews intended on using the transcript and lied to the court when she suggested otherwise. Matthews did revel in reiterating the decision of the arbitration panel at least twice in this one meeting.

216. Markowitz and Matthews have reiterated the findings of the arbitration panel to the Court on multiple occasions. When Litwok stated to the Court the case was lost over the tape, Matthews stated" I don't see it that way". Factually speaking it was the sole reason the case was lost and Matthews constantly misrepresents this fact.

217. The SEC was investigating Republic New York Securities at the same time as Kohn filed its case against Republic.

218. The SEC determined that Republic, Martin Armstrong, Princeton Economics International were involved in a scheme to commit fraud. Between 1992 and 1999, "Republic Securities prepared and delivered over 200 letters which purported to set forth the net asset value.. a majority of these letters materially overstated the account balance" (Exh.36).

219. On December 17, 2001, Republic Securities entered a plea of guilty to federal charges of securities fraud and conspiracy to commit securities fraud and agreed to the entry of an order directing Republic to pay restitution totaling $606 million. Their registration as a broker or dealer was revoked. The SEC issued an order instituting a Public administration proceeding to eliminate Republic from ever doing business again.

220. Litwok's case against Republic ran simultaneously. The charges closing Republic in the Princeton situation were similar to those of Kohn. From the Kohn suit" This arbitration arises out of the fraudulent, deceptive and illegal acts committed by the respondents. .. Republic systematically and continuously engaged in fictitious trades on the LP-1 account and the individual accounts, and fraudulently reported such trades as executed to Litwok on a daily and monthly reports issued for the LP-1 account. The Kohn case was not dissimilar to the Princeton case which closed Republic.

221. Republic Securities was on the SEC radar. The claims in the Kohn case were accurate. The conspiracy between Haveles, Farash, Brock, Eilat and others

helped to close the case. Had the tape which was not the authenticated tape, have been left out of the case, the Kohn clients would have won their case.

222. Republic was cross trading and front running so openly that Litwok got calls from traders on the floor telling her the fund was being front run. Republic was front running with Rockrimmon, a larger client. They wanted to give them a profit by using Litwok's orders. It's a tragedy the government employees used illegal tactic to close this case and violate Litwok's due process and civil rights, because there was hard evidence against the firms involved in the front running.

223. In the end, the investors, the "public interest" which is who the SEC is supposed to protect were hurt. It was more important for the SEC to protect their witness Eilat, than to protect the very people they are in business to protect " the public investor".

THE HARRASSMENT CASE

224. When Litwok saw the "for sale" signs in May 1997, she went to see Eilat. Eilat and Kane filed an order of protection to keep Litwok away from the house. Eilat told the officer and later the Court, the homes belonged to her.

225. This case came to court in March 1998 ( Exh. 37) and was dismissed. In the transcript of the case, Eilat trips over all questions about who purchased the homes. The Judge asked Eilat a series of questions which Eilat could not answer regarding the nature of the financial relationship between Eilat and Litwok

226. The government employees knew about this case and the case filed by Tom Twomey. Eilat's testimony in these two cases contradicts her testimony to the SEC. This evidence is being concealed to protect the witness in violation of Litwok's due process.

A. At the time of this case, 1997, Eilat believed the homes were hers. She also testified she "let Litwok live in the house". During the cross examination of Eilat ( Docket 97-5-414), Eilat was already thinking about lawyers and plotting about Litwok. She answered the following regarding the May 19, 1997 situation:

Q: and afterwards when you said you called the police that was not the first person you called is it?

A. no . I called my lawyer

Q: You called your lawyer, right?

A: I just said that

Q: and then you called the police?

A. Yes, I called my attorney, I discussed the situation with my attorney. I asked him whether he felt that was an appropriate step. And I was assured that was the right thing to do considering how dangerous the situation was.

Q: You thought it was so dangerous that rather than call the police, you would call your attorney?

A: I don't see a contradiction in terms.

B. Eilat's tax returns of 1995,6,7, showed Eilat taking mortgage interest deductions on the east Hampton properties ( Exh. 37A).

By not using the mortgage interest rate deducting on Eilat's own tax return and still insisting on keeping Eilat's current cooperation agreement legitimate, the government is not only prohibited Litwok's due process, but they are aiding and abetting a "criminal".

........................................................................................

THE FRAUD IN THE INSURANCE CASE.

227. Postal Inspector Farash concealed and withheld evidence relevant to the insurance case. All government employees did one thing in common. When it was better for them to have Eilat be the owner of the house, they stated Eilat was the owner. When it was better for them for Litwok to be the owner, they claimed Litwok as the owner. While the SEC might be pointing to Eilat as the owner, the IRS is pointing to Litwok as the owner. The government is trying to have it both ways and this too is a violation of Litwok's civil rights.

228. The government filed criminal charges against Litwok for insurance fraud for filing a false claim. Litwok had nothing to do with the filing of the claim. Litwok was living in a different city than the two parties working on the claim. Dalia Eilat prepared the damage documents for Chubb, hired the adjusters to help her establish the amounts, sent in the amounts and received the checks. Eilat lived in Manhattan and the adjusters lived in Florida. Litwok lived in Eat Hampton. Eilat prepared all the work from her New York City offices and worked directly with the adjusters in Florida. Litwok was not involved in the

preparation of the claim. She was physically not involved in any preparation of the claim and there is nothing in writing to show any involvement. The government employees invented the insurance claim against Litwok because she was not in the same city as anyone working actively on the document.

229. All government employees knew, from subpoenas and evidence, that Litwok was the original purchaser of the house. The purchase of both houses was done in cash ( no mortgage).

230. The government employees also knew Eilat ( Exh. 9) was in no position to buy any house. Eilat had no money.

231. The government employees also knew there was a lis pen put on the house in June 1997. This means, nothing was to be touched with regards to the houses until the case went to court. The case could not go to court because Litwok was dealing with other issues. None the less, nothing could be touched or moved.

232. Sol Farash gave testimony in front of a grand jury and wrote in his affidavit of November 25, 1997 Litwok was the mastermind behind the case. He identified several issues which he knew to be false. He knew his was a false arrest ( Exh. 38). The insurance case is entirely fabricated.

233. Farash swore to this arrest while having documents pertaining to the insurance claims, bank statements, faxed documents from Eilat, and correspondence between Eilat and Chubb Insurance.

234. Farash falsely arrested Litwok. He conspired to make up this charge for Eilat and to simultaneously hurt the "Republic case".

235. Farash falsely accused Litwok of forging two checks. He concealed facts which contradict his allegation.

236. Farash falsely accused Litwok of reporting damages on patio furniture. Farash also violated the due process and rights of Adrienne Moore, Ruth Vered and Janet Lehr when he threatened to arrest them unless they identified Litwok as the "schemer" in the case. The 3 women were afraid of Farash as he threatened to arrest them.

237. With regard to the forged checks:

A. Farash had a document from Eilat dated 3/19/99 ( Exh.39). The attachment contains a document dated 2/24/97 and concerns the "alleged" forged checks. Eilat was in contact with Chubb throughout 1997.

B. Eilat corresponded with Chubb throughout the years 1997, 1998, and in no document did Eilat mention a "forged" check.

C. Eilat's correspondence with Chubb consisted of the gathering of information about the checks. Eilat was corresponding with Chubb in February 1997 at the time she was receiving and depositing the checks. Eilat, according to the correspondence, knew exactly which checks were being deposited. If the checks were forged in February, why didn't she tell Chubb of the forged checks in February? Why did Eilat wait till October 1997 to report certain checks as forged?

D. Farash has a copy of Eilat's letter to Chubb dated June 18,1997 ( this is the day after Litwok filed a claim against Eilat for the return of the East Hampton properties). This letter (Exh.40) makes no mention of a forged check even though the "alleged" forged check happened in February.

E. Exh.41 are letter's Eilat sent to the U.S. attorney's office with regard to the insurance fraud case.

F. On October 20, 1997 (Exh. 42), Eilat is reporting the "forged" checks to Chubb and special investigators. This is at the same time as investors being contacted for the Republic case and ten days before Haveles submits the tape into the Republic case.

G. Two documents NOT MENTIONED in the sworn testimony of Sol Farash with respect to the forged checks are Exh. 43. This exhibit represents Eilat's authorization to Suffolk County bank for Litwok to deposit these and all other insurance checks.

H. Eilat had called Litwok and asked Litwok to go to the bank. Litwok never left the house during trading hours. Eilat urgently needed to get the checks deposited and asked Litwok to do it. A letter was sent to the bank regarding one check and a second letter, authorizing the deposits of all checks went to the bank.

I. In her effort to "create" a forgery claim, Eilat forgot to shred the two faxes authorizing the check deposits. Both the SEC and the U.S. Attorney's office have copies of these faxes. In spite of the "outright instructions the bank and Litwok" had to sign and deposit these checks, the U.S. attorney's office with Sol Farash filed a false claim and violated Litwok's rights. The government is aware of and has a copy of these "permission to sign and deposition letters to the bank". These faxes nullify any claim of "forged" checks. This is not a case where the

government did not due diligence. The government has the information and is willing to violate Litwok's Constitutional rights and prosecute her knowing the facts.

J. THERE WAS NO FORGERY CASE. Eilat didn't think it was forgery when she was in contact with Chubb, never mentioned it to Chubb, and attempted to frame Litwok by having her go to the bank. Eilat was "gathering" documents. It did work, Eilat did have Litwok arrested. Her failure to shred additional documents shows she didn't think of everything.

238. Sol Farash state " I am informed by a representative of Suffolk County.. that both checks were deposited into account number held jointly by Adrienne Moore and Evelyn Litwok". Since Dalia lived in New York and the repairs had to be done in East Hampton, the checking accounts were handled by adjuster Adrienne Moore. Litwok was a back up signer.

239. Farash lied to the Grand Jury and lied to the Court. He concealed information which would have proven Litwok was innocent. By doing this, Farash falsely arrested Litwok. Litwok and her family were forced to spend $1,000,000 to defend herself, and her life was taken away from her. None of this should ever have happened.

240. Farash did not stop at perjury to the Grand Jury. On December 8, 1997, a few days after Litwok's arrest and shortly after an arbitration session, Farash came to the Duke Drive house at 9:00 a.m. He insisted Litwok open the door as he had a subpoena.

241. Farash was removing patio furniture from the garage ( as it was winter). Litwok called attorney Twomey who spoke to Farash and determined Farash had no subpoena.

242. Twomey instructed Farash to leave the house and return the property. Farash did not leave the house not return the property.

A. Farash had a letter from Eilat dated 12/8/97 ( Exh. 44). This letter gave Farash permission to remove whatever he wanted. In this letter, Eilat acts as the owner of the house. Farash and Eilat both knew a Lis P was on the house and nothing could be removed.

B. In this situation, the government uses Eilat as the owner of the house. In the IRS case, Eilat is not the owner.

C. Farash and Eilat concocted a story about the patio furniture which they were trying to use against Litwok. Their story was; the only set of patio

furniture that ever existed was purchased in 1995. It was bought, delivered in 1995 and divided between the two houses.

The problem with their story was it was not true. Eilat forgot that the furniture delivered in 1995 all went to one house. The Duke Drive house was purchased with patio furniture (Exh.45).

This was a problem for them because they had to get rid of some of the furniture in order to make their version work. Sol Farash came over to Litwok's home in order to physically remove the furniture. He took some but not all he had planned on taking. There was a problem with the patio furniture portion of their grand jury testimony.

E. Farash was trying to cover up the false story about the splitting of the furniture. He stated under oath the furniture was purchased and divided between Duke Drive and Aborigine. He stated the insurance claim for damaged furniture was false. Yet Farash came to the house to remove the furniture because its existence would make him and Eilat look like liars. If he could remove the furniture in the garage, it would make their story work. He did manage to take some of the furniture and to this day, has never returned it to Litwok. No doubt it is at his house in his backyard.

243. It was a violation of Litwok's right to privacy and protection under the Constitution that Farash was violating.

244. The government employees in both cases knew about these false elements in the insurance case. Litwok personally told several prosecutors and attorneys. They knew and let this case interfere with Litwok's life for almost 9 years. Farash and other government employees were also obstructing justice.

245. Tom Twomey, Litwok's attorney instructed Farash to leave the house and not to take anything with him. Twomey filed a complaint with the U.S. Attorney's office. Twomey stated "in view of this shocking behavior by Mr. Farash, I recommend that he be dismissed from your employ. Not even rudimentary regard for the proper criminal procedures was followed" (Exh.1)

246. The U.S. Attorneys office did no investigation of Sol Farash. Had they investigated his behavior, they would have discovered his phone calls to investors, his offer of subpoenas, his requests to have them send letters and his rewriting of the story to violate Litwok's Constitutional rights.

EILAT AND THE TAX RETURNS

EILAT UNDERREPORTS 23,000,000 MILLION DOLLARS AND THE IRS LOOKS AWAY

247. In August of 1995, Bob White from Markowitz, Preische & Stevens was hired to prepare tax returns for Litwok and Kohn for the tax year 1995. Litwok went with Eilat to the first meeting. It was Eilat's salaried job to provide White with all the documentation from he needed to do a return.

248. White faxed questions to the office and Eilat responded (Exh. 46)

249. A tax return was prepared for Dalia Eilat and her companies. Eilat provided White with the information on Litwok for the preparation of her tax return. Litwok believed a return had been filed. Litwok gave the accountants power of attorney to file.

250. In March of 1997, the same time as Eilat was taping Litwok, talking to Chubb, and trying to get Litwok to sign a contract, Eilat went to Bob White's office. According to White (Exh.47), two people from our firm met with Dalia on March 8, 1997 to review questions with regard to 1994 and summarized... The next meeting was March 10th with Dalia at which time 1994 records were returned to Dalia".

251. Eilat went to retrieve the evidence from the accountant for two reasons. She had the accountants work on her personal and business returns instead of the Litwok and Kohn returns. She also wanted to retrieve any return prepared in relation to Litwok so there would be no evidence of a return. This was another part of her plan.

---

LITWOK TALKS TO THE GOVERNMENT WITHOUT AN ATTORNEY

252. Litwok had an attorney named Edward Sapone between 6/02 through 8/04. Sapone left the case in a hurry with no explanation to Litwok. Litwok had just given Sapone $5000.00.

253. Following his departure, Litwok and the U.S. Attorney's office agreed to meet with Litwok and her CPA, Ted Lackowitz. It was agreed to have 3 meetings. The first two meetings was for the purpose of going through the various Litwok and Litwok related account. Litwok had told the AUSU in front of Judge Wexler, she believed she could show there was no income to report in

1995. Litwok also stated she hoped, if she provided the information the government would withdraw its case.

254. Litwok understood there were to be no guarantees. At all times, Litwok was looking only for a withdrawal of the case. Litwok told Martin she was willing to show him her evidence if he was open to withdrawal, not a plea.

255. A third promised meeting was for Litwok to show AUSA Martin, a box of documents regarding Eilat. Litwok wanted to show her perjury, her contradicted testimony and her history of theft.

256. Clifford Brock, a female Criminal investigator and John Martin AUSA attended the meetings. The 2 million dollar math error was brought up again. Following the meeting, the AUSA agreed to reduce the tax issue by two million. They were several other "math" mistakes by the IRS which similarly had to be removed.

257. The case for the IRS and U.S. Attorneys office went from 8 million to 6 million in a matter of minutes once they eliminated the 2 million dollar math error. As the two sessions went on, taxable income was lowered because of analysis provided by Litwok's accountant. The IRS and the Criminal Division of the IRS did not do an independent analysis separate from the one prepared by Eilat. This is a total lack of due process. Here information obtained from a witness is the sole source of the arrest. These government employees never did their job. At the end of the sessions, the only taxable income was the East Hampton properties, which had been taken over by Eilat in 1995.

** Even though the title had changed and Eilat had reported the homes on her tax return, AUSA John Martin said, he could still go to trail with the houses as the tax case because it was " a matter of opinion who really owned the homes!"

*****The government at this point had kept Litwok in a state of fear , a life on hold for 8 years. In the face of the evidence of Eilat as the home owner, the government was still going to violate Litwok's Constitutional rights and prosecute Litwok because they could.************

258. During the course of the two meetings Litwok's CPA showed Dalia Eilat's tax returns. The AUSA was to let Litwok know if they had been filed. John Martin was to let Litwok know if any returns were filed on Debut Productions.

259. Debut Productions had roughly $700,000 transferred to its bank accounts in 1995, 96, 97. Litwok wanted to know if Eilat reported any salary or income on the return.

260. During the meeting, Lackowitz offered a look into Eilat's personal tax return from 1995. In the 1995 return, which Eilat's claims to have filed, there is a capital gain of 2 million dollars. Transfers (Exh,7) reflect a portion of the gain which was transferred out and used. NO TAXES WERE PAID ON THE 2 MILLION DOLLAR GAIN , even though the money was clearly transferred out of the account to Eilat's business bank accounts.

***** The government has never looked at the tax returns of Eilat. Eilat has roughly 4 million dollars owed in taxes and this government has made no effort to prosecute her because she pointed the finger at Litwok********

262. Lackowtiz also pointed out that proceeds from the Republic statement was underreported by 23,000,000 million dollars. Eilat's tax return was missing 23,000,000. This seems to bother the government employees, but not enough to do anything against Eilat including arresting her for tax evasion.

263. Eilat also claims mortgage interest deductions for 1995. The tax case rests on who owned the East Hampton properties in 1995. By taking the mortgage interest deduction, Eilat is admitting to owning the homes in 1995. In spite of this, the AUSA still feels at trail, it will be Eilat's word against Litwok's. Again, there is no intention to file criminal charges in the face of factual evidence.

264. The IRS has a check and balance system. Employers, banks and brokerage firms provide independent source information reflecting the income of a particular person ( based on social securities numbers). The gross proceeds reported by Republic and the underreporting of 23,000,000 would have been picked up by IRS computers if Eilat had filed her return. The only explanation for the system not catching the 23 million dollar error is that Eilat falsely presented tax returns which were never filed.

265. Everyone at the meeting knew Eilat didn't file returns she gave the government. Eilat, in over 7 depositions has sworn to have signed and filed those tax returns. Given the 23 million dollar problem, Eilat could not have sent in the return. Eilat lied to the government when giving them her returns. The cooperation agreement has been violated and the government will not alter its plans.

266. Eilat has signed cooperation agreements with the government and is their primary witness against Litwok. Without her testimony, there is no case. Here again, the same government who will not withdraw a false claim against

Litwok is willing to not file criminal charges against Eilat who reported and spent the 2 million and who underreported by 23 million.

267. The government has never contacted or deposed Theodore Haag, the accountant who prepared the tax returns. There was no due process for Litwok since Eilat's returns were never examined. The IRS, the SEC and the U.S.Attorneys office have never questioned or subpoenaed Haag's records. The do not want to know of any Eilat fraud because it would effect their case against Litwok.

268. At the end of the meetings, the government's numbers were reduced to the East Hampton homes and a loan. The AUSA Martin told Litwok he still intended to go to trial because Eilat would be a good witness for the government.

269. Litwok realized she had given the U.S. Attorney all her defenses and he had no intention of ever withdrawing the case. The government could now use Litwok's testimony to "tailor" their case against Litwok. Litwok helped define the new and improved tax case against Litwok.

270. AUSA Martin called Litwok at home in the evening to go over what Litwok might say about the homes and the loan. Three hours were spent on conversations regarding these two issues. Afterwards, Martin said, well I don't see it the way you do and I think my witness will present a problem for you.

271. John Martin was questioning Litwok to find out every possible thing she would say. Litwok was answering with the hope he would see the facts. There is no doubt Eilat claimed 2 million dollars of income. Martins answer is the tax return is irrelevant to the case and he will make sure the returns do not get in.

272. Litwok realized Martin never had any intention of withdrawing the case even if the facts were true. In effect, it would have been better to have let the IRS go in with the 8 million dollar figure and prove how little the government knew about their own case.

273. After seeing where their tax case fell short and would have to be reworked, the government had no meeting about Eilat with Litwok. Once Litwok testified and provided a complete review of her documents and copies of tax returns, their interest was to go to trial. There was no interest in prosecuting or looking into the behavior of Eilat. A typical "cooperation agreement" with the government states "should it be judged by the office that the defendant has failed to cooperate fully or has intentionally given false, misleading or

incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from her plea of guilty but this office will be released from its obligation under this agreement" (Exh. 48/p.6)

274. Ausa Martin did not want the information on Eilat because the information would show Eilat's violation of the cooperation agreement. Eilat was needed to prosecute Litwok. Without Eilat, both the insurance case and the tax case would have to be withdrawn. Since the case was 9 years old, ready for trial and cost the government money, it was easier and cheaper to withhold the "damning" information and violate Litwok's right to due process.

275. The AUSA and the IRS would like to go to trial stating the East Hampton properties were owned in 1995 by Litwok. They are planning to do this in spite of deposition after deposition, where Eilat claims to be the owner of the house. Eilat's 1997 response to the Litwok lawsuit has Eilat stating the homes were hers in 1995. There are more than a dozen documents sworn to by Eilat claiming the homes belonged to her in 1995. In 1997, Eilat gave permission to Farash to go into "her" homes.

The U.S. attorney's office is limiting its view on this case in order to win it. The obligation is to be FAIR and to take a braod view of the case. They are no longer prosecuting Litwok, they are persecuting her.

276. There should be one set of rules, instead there are a broad set of rules defined by the government employees themselves. They have no accountability so they can do whatever they want. There are no regulatory bodies overseeing their cases. There are no consequences to the way they prosecute cases.

277. The government is permitting Eilat to get away with tax fraud because she pointed the finger at Litwok first. Whoever gets to the U.S. Attorney first is the one who is free. Who would think to go to the U.S. Attorney? Litwok's answer is only the gulty party.

278. The IRS has been chasing celebrity actor Wesley Snipes since 1992. Even though there are federal guidelines based on the amount of money, Mr. Snipes was not arrested and is settling with the IRS. If you are a celebrity they not only don't violate your rights but they ask you for an autograph afterwards. Where are the rules for everyone? Why aren't the rules the same?

THE SEC ATTORNEYS FOR THE NORTHEAST REGION NEED AN ACCOUNTABILITY REVIEW

279. Just as the U.S.Attorney's office protected and still protect Eilat, the SEC have similarly protected her since 1997.

280. Between 1998 and 2002, Litwok's attorney Sean O'Shea corresponded and met regularly with attorneys from the Northeast Region of the SEC: Mark Schoenfeld, David Rosenfeld, and Jonathan Chovlovsky among them.

281. Government attorneys from the SEC have not only violated Litwok's Constitutional rights but have used Anti - Gay, Anti-Semitic tactics in their case. Over the last 9 years, in over 50 filings and court appearances, the government attorneys have lied over and over about even the smallest of details. They have perjured themselves, mischaracterized Litwok. Because it involves so many of its attorneys, these methods are "institutionalized" into the Northeast region of the SEC. It is open and flagrant and there is no administrative or compliance department holding their behavior in check.

282. The SEC is only concerned with winning the case. David Markowitz is obsessed with the Lesbian lover portion of the case. He cannot say Dalia Eilat's name without adding a phrase such as, "the former lover of Evelyn Litwok". In reference after reference, he attached some variation of the phrase the former lover, the former partner, the live in companion. He should be working at "STAR" magazine, not the SEC,

283. Even after Eilat's clear dislike for Litwok ( in her deposition of July 2004, M &M laughed when Eilat said she hated me the day after she met me), David Markowitz, assistant regional director of the Northeast Region of the SEC stated to Judge Lindsay on November 23, 2004 ( Exh. 49), "It is simply that in our complaint we allege that certain monies went to Ms Eilat who had a relationship with Ms. Litwok (p.59-63). On P. 16, the same day, and a half hour earlier, Markowitz stated "Ms. Eilat, who was Ms. Litwok's former partner in this,,,,Markowitz canot stop himself telling this lie.

284. It is a strategy in the SEC case to link Eilat and Litwok's as lovers, At every opportunity they try to get the "lesbian" issue on the record. The strategy is to use this bias repeatedly against Litwok. Markowitz would not be referring to heterosexual couples in the same manner, for example, as Ms. Eilat who was lovers with a hypothetical "Mr. Wharton" is just not as interesting. It is only

done with lesbians and gay men to use already existing bias and to appeal to prejudice. The Homophobia being used against Litwok is a violation of her Constitutional rights.

285. The enforcement branch of the SEC had to be contacted by Mr. O'Shea as early as 1998 because of "a serious breach of ethics and of the United States Constitution committed by Jonathan Chovlovsky, a staff attorney under supervision ( Exh. 2 & 4).

286. In March and April of 1998, Litwok participated in two 341 Bankruptcy hearings. The SEC was informed in advance of the meetings Litwok would not be testifying. Litwok's bankruptcy counsel was Instructed to have Litwok assert her privilege during the hearings.

287. Litwok's attorney spoke to Chovlovsky. He stated "Litwok was asserting her privilege against self-incrimination. He (Chovlovsky) stated that if she was doing so, it would be pointless in bringing her in to testify, and asked if Litwok would be willing instead to submit an affidavit in which she asserted her privilege".

288. Chovlovsky did not send the affidavit prior to the 341 hearings.

289. The conversation between Litwok's attorney and SEC attorney Chovlovsky occurred ahead of the 341 first bankruptcy hearing in which Litwok appeared.

290. Jonathan Chovlovsky told Litwok's attorney the SEC would not attend the 341hearings and Cholovsky would not attempt to question her. Chovlovsky did attend the 341 hearings and deceptively turned over the SEC questioning to another SEC attorney present at the hearing.

292. In front of and during the hearings, the SEC attorneys harassed and threatened Litwok to get her to testify. Litwok was told "not to testify". The SEC attorneys privately told her there would be "grave" consequences if she didn't.

293. Litwok had to physically walk out of the 341 hearings because the harassment was so intense. Litwok's attorney had given the SEC instructions and did not appear assuming those instructions would be respected.

294. Exh.2 is the letter sent from Litwok's attorney to the Enforcement Division of the SEC. Even the Postal Inspector attending the meeting told Litwok's attorney "Mr. Chovlovsky's conduct, was at a minimum, highly questionable".

295. Mr. O'Shea letter stated that Mr. Chovlovsky "actions represent a serious violation of professional ethics, such as Discipline Rule 104 (a)(1) of the Code of

Professional Responsibility, and "the Commission's own conduct rules and policies. Mr. O'Shea went on to memorialize Litwok's fifth amendment privileges".

296. Litwok's fifth amendment privilege from the March 341 hearing was trampled and the infringement of the self-incrimination and due process clauses of the Fifth Amendment and right to counsel of the Sixth Amendment were compromised.

297. This letter was meant to also let the SEC know that Litwok reserved the right to pursue "ameliorative judicial action in the future with respect to the events of the "341" meeting".

298. Litwok's attorney sent the March 31st letter at roughly 5:00 p.m. The letter was sent to the Enforcement Division. IN a not so surprising response less than 12 hours later ( Exh. 50), Associate Regional Director Andrew Geist ( not a part of the enforcement division), in the 'INSTITUTIONALIZED- THE SEC DOES NOTHING WRONG AND EVEN IF WE DID YOU CAN'T TOUCH US ANSWER", understood that Litwok's attorney was ":making serious charges of misconduct". Mr. Geist did not take this serious action "seriously" and did nothing about SEC attorney Chovlovsky's behavior. Chovlovsky's record shows no investigation into his conduct.

299. Geist states "the Commission staff has standing to take all necessary steps in Ms. Litwok's bankruptcy case to protect its creditor status". Andrew Geist continues on citing the case with reference to the SEC

300. In the April 2003 sudden filing of Eilat's bankruptcy, the SEC made no effort to "use their creditor status". The SEC could have filed as a creditor but chose not to.

301. David Markowitz referred to the Eilat bankruptcy as "hollow" while Judge Lindsay referred to the relationship between Eilat and the SEC as "dubious".

302. The listing of Eilat as a relief defendant was part of an SEC strategy. The SEC had no intention of prosecuting her. The SEC listing Eilat as any kind of defendant was deceitful since they planned to let "Eilat" out of the case. The SEC has refused to define or explain their relationship with Eilat. Litwok suspects Eilat was kept in the claim, if order to keep the 1.3 million dollars as part of the complaint. As said previously, this claim is false because Eilat took money out of her own account and sent it to herself. Perhaps the SEC has a

policy regarding the winning of money in a case. Maybe the Pay bonus is bigger if monies are part of a charge.

303. If the SEC deems themselves to be a large creditor of Litwok's and therefore allowed to pursue dischargeability, then why did they not pursue a non-dischargeability against Eilat for the "alleged" 1.3 million she received in the complaint (Exh.15). Perhaps it is because the SEC knew Eilat did not receive 1.3 million from Litwok, Eilat sent the money from her own account to her business account. The SEC did not want this to come out. It would mean a portion of their complaint would have to be withdrawn.

304. Andrew Geist is lying in his April 1 letter when he states" prior ro the meeting, the Commission staff contacted Litwok's bankruptcy counsel Michael Macco". This is a lie and Macco states so in his letter to O'Shea ( Exh. 5).

305. Litwok's attorney states to SEC attorney Alberto Troncoso, "there are at least two significant factual inaccuracies in Mr. Geist's letter". Litwok's bankruptcy attorney informed Litwok's attorney. O'Shea, that he was not contacted by the SEC and this "assertion is flatly untrue, he had no prior notice of the Commission's intentions". Is there anything in Mr. Geist's record at the SEC indicating he had lied in a letter to Mr. O'Shea. This is not only a lie but it is mail fraud as it was sent through the United States Postal Service.

306. Macco stated "at no time did the Commission contact me and advise me that they would be attending the meeting"

307. Geist states "Litwok voluntarily responded to numerous questions". This is also untrue. Litwok was told in "No uncertain terms", if she did not testify these would be grave consequences. SEC attorneys told this to Litwok.

308. According to Litwok's attorney, the Commission deliberately used a bankruptcy hearing as an "end-run" around Litwok's criminal defense counsel. Chovlovsky knew Litwok asserted her Fifth Amendment privilege and knew Litwok's criminal counsel would not be in attendance at the bankruptcy hearing.

309. Chovlovsky willfully and purposely led Litwok's attorney to believe the SEC would not be making an appearance at the hearing. Chovlovsky was supposed to send an affidavit, but intentionally did not send the form until after the meeting. He conveniently opened the door to questioning Litwok.

310. Chovlovsky and Geist both lied about conversations with Litwok's bankruptcy counsel. Neither Chovlovsky nor Geist were brought under any kind of review by internal SEC enforcement.

311. Less than one year after these events, Troncoso, was the lead investigator in the Litwok /SEC matter. He personally took the deposition of Adrienne Moore with Cholovsky. Moore was living with Litwok in 1996 and 1997 ( Exh.10).

312. Moore was perfectly clear when she told Troncoso and Chovlovsky Litwok told her of the risk of the fund. Moore told both men she knew the money was lost in trading. Moore contradicts the allegations against Litwok made by the SEC in the 12/27/00 filing. Troncoso and Chovlovsky helped draft the complaint against Litwok. Moore was ignored as a witness ( Janet Davis and Ileen Gottlieb would also testify to understanding the risks, yet the SEC still kept the "misrepresentation" portion as part of their factual case).

313. Troncoso was the branch chief of the SEC. By 1999, he had heard testimony from Moore and from Peter Testaverde, the last accountant used by Kohn.

314. According to the SEC claim, under Nature of the Action, p.2, and the SEC states Litwok misappropriated $3,000,000. This is a fact which all the attorneys involved in this case over the last 8 years knew to be false.

315. Matthew and Markowitz have made significant efforts to block Ted Lackowitz, Litwok's CPA, from testifying. During the Lackowitz deposition, Lackowitz stated that the 3 million dollars in the claim is not accurate.

316. Lackowitz told Matthews the report generated by Peter Testaverde was based on incomplete information. Testaverde only calculated the withdrawals taken out of the fund. Testaverde had 2 million dollars in deposits that were unidentified. If Testaverde had looked at more than one account, he would have seen the money deposited came from Litwok. Testaverde never asked Litwok for her personal accounts and never tied the withdrawals and deposits between Litwok and Kohn together. His report and working papers refer only to one brokerage account. Testaverde did not use the Kohn bank account as part of his equation.

*******His report and analysis were comparable to someone trying to make chocolate chip cookies with only having one ingredient , the chips**** Testaverde was irresponsible.

317. In recent meeting with Judge Irizarry Matthews and Markowitz went to great lengths to try to preclude the Lackowitz testimony. Again, the winning of the case is vital. The right do due process is not.

318. Markowitz and Matthews are willing to violate Litwok's Constitutional rights at the expense of winning their case.

319. Matthews and Markowitz are aware of problems with the testimony of Peter Testaverde, the accountant responsible for suggesting Litwok took excess compensation of 2.3 million dollars.

320. Troncoso, several years earlier in 1998, was told by Testaverde (Exh. 51) "withdrawals , when the money came out of the partnership, there was enough P & L in there to cover it. In other words, Litwok took what she was allowed to take.

321. According to Peter Testaverde, Litwok did not misappropriate funds. The deficit Testaverde was referring to was not to an overtaking of money by Litwok, but a "possible excess due to a subsequent loss in the fund:.

322. Troncoso, Chovlovsky and the other at the SEC who wrote the complaint, intentionally mischaracterized the monies taken by Litwok. Their release was given to the press in Long Island. They called it a misappropriation when they had no factual basis for that statement. That description of Litwok was reprinted in both newspapers and the internet.

323. None of the staff have an interest in a FAIR reporting of the facts. They have done everything to close down Litwok's ability to demonstrate the false and defamatory nature of the financial complaint. The financial claim is false, fraudulent and demonstrates the extent the SEC attorneys would go to violate the rights of an individual.

324. Troncoso had heard the testimony of Testaverde and Moore. Troncoso allowed Eilat and Litwok to be described as live in companions in spite of the testimony of Moore, who was living with Litwok. Troncoso and Chovlovsky set aside one deposition and falsified the facts in this case.

325. In 2002, David Markowitz was added to the Litwok case. Three letters dated; March 22, 2002, April 25, 2002 and October 29, 2002 is representative of the Markowitz approach to the SEC v. Litwok case (Exh.52).

326. Markowitz wrote his letters in a very specific style. They were designed to have "the trial through his letters" campaign. Instead of asking for an extension in one paragraph, Markowitz used the "letter" opportunity to write a

two and three page letter to reiterate the charges ( in case the Judge forgot), to describe Litwok as someone who perpetuates fraud and so on. His used his last paragraph to deal with the real reason for the letter, usually an extension( the last paragraph was the only paragraph used for the real reason for the letter).

327. For example, in the March letter, Markowitz states "Litwok has failed to answer or otherwise respond to the complaint( this has nothing to do with his request for an extension). In the April letter, Markowitz *used Italics, more than a year after her time to answer or otherwise respond had expires...* Litwok has not appeared or otherwise participated in any conferences or proceedings in this litigation ( this has nothing to do with his request for an extension).

328. On Page 3 of the October letter, *in italics. More than a year after her time to answer or otherwise respond had expired...(this has nothing to do with his request for an extension).*

*****in three letters Markowitz falsely repeats the same sentence ***

329. Markowitz style of repetitive reporting to the court remains a constant in all his letters. Another constant "Litwok has done nothing about this case which was filed on 12/27/00". This is a lie and violates all ethical principals. The SEC had been engaged in talks with Litwok's attorneys between the years 1998 and 2002. Markowitz was aware of the settlement negotiations ongoing between the SEC and Litwok's attorney.

The purpose of all 3 letters was to ask for extensions, but the ingredients was the repetitive reminder of the charges against Litwok, her "alleged" failures in the case and a "sub trial " to the actual trial, an SEC tactic.

329. In reality, two years earlier, on May 4, 1998 (Exh. 53) Litwok through her attorney provided documents responsive to the SEC subpoenas. In spite of getting all Litwok's documents, Matthews and Markowitz created a document request to make Litwok give the SEC documents they already had in their possession. They fought for documents with threatening letters when in the end, they had all the documents already ( from 1998). There request for documents was in a different format. They were deceptive and tried to create problems, when subpoenas from 1998 gave them the same documents.

*********This SEC strategy of falsely accusing Litwok of things, write horrible comments in letters, and ask for things in a different way are all a violation of the defendants civil rights and right to due process ***************

330. At the same time as Markowitz was claiming "Litwok to be a non responsive participant", Frank Moore was working on a settlement with Litwok's attorney on June 4th,2001 (Exh. 54). Markowitz was part of the SEC team working on the Litwok case. Markowitz is purposely lying to the Court in violation of Litwok's rights. Markowitz behavior is inexcusable.

331. On June 23, 1998, the SEC provided Litwok with a document to assert her 5th amendment privilege ( Exh.55) and on November 20,2001, Litwok's attorney provided the SEC with financial information for the purposes of discussing settlement ( Exh. 56).

332. Markowitz letters are designed to imply a complete lack of Litwok's participation in the case even though the opposite was true. It is not said once or twice, but three times , and in *italics* to make sure the Court knows. Markowitz is attempting to bias the Court against Litwok through a methodical strategy designed to hurt Litwok. He is a liar, deceptive and willing to make false statements knowing his office was actively working with Litwok's attorneys. If there was supervision at the SEC, someone would have picked up some SEC staff were working on settlement while Markowitz was describing a completely different scenario. It can best be described as the case of "Personality Disorder by the Sec Attorney's". Supervision might have limited the violation to Litwok's due process and violations to her civil rights. The M & M staff was willing to include only information that would make their case.

333. The March Markowitz letter was a Markowitz request for an extension hidden behind the Litwok diatribe. The truth of his letter is in the last paragraph. The SEC needs a delay and it does so in one sentence at the end of the letter.

334. This type of false letter is used by Matthews and Markowitz between 2002 and 2006. By 2006, Matthews and Markowitz were stating Litwok delayed the case for four years. They did this knowing the SEC was primarily responsible for the delays. Their efforts were not ethical and were not FAIR. In the latter years, M & M "made up" more and more lies. Those lies went unchecked by supervisory staff at the SEC,

335. In the April letter, Markowitz wanted to amend the scheduling order because the SEC had not received Eilat's response. While this was the purpose of the letter, once again Markowitz uses the letter to lie about Litwok's involvement in the case, "Litwok has not appeared otherwise participated in any

conferences"...The tactic of berating Litwok and leaving the request for the last paragraph is classic Markowitz and Matthews.

336. In October, Markowitz was still litigating the case in every letter. The docket for this case is filed with raging letters from Markowitz and Matthews.

337. In the April letter, Markowitz paragraph#2, BY WAY OF BACKGROUND . This became another added format for the Matthews /Markowitz letters which turned into reiteration of the charges and a way to restate the failure's of Litwok. These letters were repetitive lies used over and over by M & M.

338. This tactic of By way of background was used to make false statement by M & M. In the April and October letter, the paragraph also contained A NEW FORMAT "an example". This new format- "For example, the complaint alleges that Litwok misrepresented to investors their investor funds would be used to purchase and sell securities and that she would receive only a percentage of the profits as compensation when in face, despite the absence of profits, Litwok immediately diverted investor funds for personal use.

339. The entire "For Example" is a lie. Markowitz had done two things with his statement; 1) he rewrote the private placement memorandum by stating Litwok would take "a percentage" when he knew this to be false, and 2) he stated as if it were true- despite the absence of profits, Litwok immediately diverted funds.

340. The Confidential Private Placement Memorandum ( Exh.57) states on P. 24 that Litwok was entitled to 20% of the profits ( this is the before it was amended.

341. Why would Markowitz, who heard Testaverde repeatedly say, "Litwok never took more money than she was allowed" outright lie about when Litwok took funds. Markowitz made up the statement despite the absence of profits, Litwok immediately diverted funds. Why is this man still working as an attorney when he lies for a living.

342. Both Markowitz and Matthews repeatedly lie about facts not in evidence. It is Litwok's constitutional right to have the evidence be authentic and not made up by two staff people whose ambition to move up the SEC ladder of success has blinded their truthfulness

************************************************************

TESTAVERDE/GOLDSTEIN GOLUB KESSLER

343. Markowitz statements about Litwok diverting investor funds is a prejudice to Litwok

344. Peter Testaverde of Goldstein Golub Kessler was deposed a number of times. In his April 2003 deposition (Exh. 57), on p. 51, Testaverde reading from his only report dated August 12, 1994 through July 6, 1995, stated "the general partner had a capital account of $545,560". This means, that as of July 6, 1995, Litwok left over $545,000 in the fund. This was money she was entitled to take out. This was at the 20% level ( not including the amendment) and without accrual accounting.

345. In August of 1995, as a direct result of trades regarding Texas Instrument, the subject of Litwok's case against Republic New York Securities, the loss from the August trades caused the fund to go down and show its first loss in 1995,

346. Litwok did not owe the fund money till it went down in August 1995. The prospectus allowed for two options; 1) to repay or 2) to wait till there were more profits.

347. Testaverde one report only examined the fund till July 6, 1996. There was no analysis between July and December of 1995. Testaverde had only working documents. In the working documents there was close to 2 million dollars deposited back into Kohn LP-1. Testaverde did not have a name attached to the deposited funds. Testaverde did not know who deposited the money. Testaverde admitted thee facts in his depositions.

348. A .Troncoso and Chovlovsky, present at the 1998 deposition of Testaverde, heard him say ( Exh58/P.42) the language of the agreement ( referring to the prospectus) was that the general partner,. If there was an overdraw, would either restore it or not take profits again until it- the partner- the rest of the partners were restored". Troncoso and Chovlovsky heard from the accountant, Litwok had options according to the operating agreement of the fund. The SEC attorneys committed fraud is saying any money was misappropriated.

348. The SEC attorneys know that 3,000,000 as written, in their claim was not misappropriated, They know Litwok took the money she was allowed to take. They also know Litwok was entitled to pay it back. To call it a

"misappropriation" is a violation of Litwok civil rights. It's a false claim and all the government employees know it.

349. The SEC lawyers have not removed the 3,000,000 dollar misappropriation claim; they have not removed the 1.3 Eilat lover portion, even in the face of their own evidence.

350. Each line of the claim against Litwok is false. The SEC deposed clients who verify the SEC has put in a false claim. In spite of the evidence, the SEC hopes to use the chocolate chips out of the cookie to convict Litwok. In order words, leave out everything but those sentences that can convict. This is similar to what Peter Haveles did with the "alleged" tape. He took a tape with 44 conversations, edited it done 75 % to the nine "excerpts" edited to show Litwok to be lying and use it. The problem is the 9 excerpts were not the truth they were the edits.

351. The SEC is trying to win a case by editing all the facts. They will leave sentences out in order to make a case. It is their obligation to look at the whole case and provide for a fair process. There hasn't been a single day this process has been fairly prosecuted. The SEC should not be able to pull a HAVELES and get away with it.

352. Peter Testaverde provided the government with "working documents". These were strictly his working papers and by his own admission, he did not analyze anything. The documents contained large sums of "unidentified" monies form September, October, November and December 1995.

From Testaverde testimony (Exh. P.107)

Q: My question is, you testified earlier that it was your opinion in 1995 that Evelyn Litwok withdrew in excess of 2.37 million dollars from Kohn LP-1?

A: Yes

Q: My question Is, is Evelyn Litwok, in fact, Defendants 2 ( where deposits of close to 2 million were unidentified) , if this $963,395.64 arrived here through Evelyn Litwok, would that reduce 2.37 million dollar figure?

A: yes. Continued on P.108

A: If she contributed back $963,395.64 and if we failed to take into account in computing the amount of her over draw, then this amount would serve to reduce the amount of the over draw.

353. Through the next ten pages of that deposition and the 3 others taken, larger amounts of deposits were shown to Peter Testaverde. He had no way of

"knowing who made this deposit". Litwok believes Testaverde had the unidentified working numbers in his documents and it was his ethical responsibility to find out who made the deposits before sending out a "dangerous' letter to clients ( Exh. 60).

354. Markowitz and Matthews who repeatedly describe Litwok's behavior as a diversion of funds, were at the Testaverde depositions. There is no mistaking Testaverde prepared only one flimsy report. The report was limited to an end date of July 4, 1995.

355. The unidentified deposits from the working papers were pointed out in each deposition, yet the SEC purposefully ignores that fact and goes on with their case. It has been pointed out to Markowitz and Matthews exactly where the money came from. Testaverde was asked to identify and debits and credits from Litwok's accounts during his deposition. He acknowledged the debit from Litwok and the credit to Kohn. Yet, Litwok can hear Matthews saying, "well the SEC doesn't see it that way". This is SEC Vision Arrogance.

356. There is factual and specific evidence to connect the unknown deposits to Litwok. This is intolerable to Markowitz and Matthews. They are deliberately withholding the evidence to the Court.

357. Testaverde was retained in January 1996 to prepare tax returns for Kohn LP-1 and KOHN LP-3 (Exh.61).

358. Litwok and Testaverde discussed working together in mid September of 1995 ( Exh.62).

359. Testaverde was not hired to do anything else. Testaverde thinks he had other responsibilities, but the only engagement documents signed with Litwok were for the tax return and audit of Kohn LP-1 and Kohn LP-3.

360. Testaverde group was working on creating a report on Oct 4, 1995 but was missing significant information ( Exh. 63)

361. In spite of missing significant information, Goldstein Golub Kessler provided Litwok with a report. Litwok did not believe this report could be accurate given the missing information and the less than two weeks they had to work on it.

362. There was no report or work prepared for Litwok following the release of this November 3, report.

363. Bills from Goldstein Golub reflect work being done but little of it was authorized by Litwok. Litwok wanted the tax returns and Testaverde built up many bills with none of them having to do with the tax return.

***Goldstein Golub Kessler Bills reflect Testaverde billing of Litwok for audits but no audits were produced. Bills reflects billing for work not agreed to in retainer ( Exh. 63A).

364. In his defense, Testaverde claims he was not authorized to speak with Republic and was missing information. This is not accurate. Testaverde could not speak with Republic following the filling of the law suit on April 16,1996. The tax return for Kohn would have involved tax year ending December 1995. Testaverde had all the documents for the return. Anything he needed for 1995 could have been obtained.

365. Testaverde and Litwok had no contact after the November 1995 report was finished until July of 1996 when Testaverde made Litwok's attorneys aware he planed to send out a statement to the limited partners of LP-1. Following an 8 month lapse of conversation, Testaverde surprised Litwok and Litwok's attorney's with a draft of a letter.

366. For weeks before the letter was sent to clients, Litwok's attorneys begged him to meet with Litwok because there were unidentified deposits Testaverde had not accounted for. Testaverde refused to talk to or meet with Litwok. The attached letter is the last letter to Testaverde from Litwok's attorney's ( Exh. 64).

367. Litwok's attorney's begged Testaverde to look at the deposits. This was particularly important as the arbitration was just beginning and this would be devastating to investors and potentially to the arbitration.

368. Testaverde refused to take the unidentified deposits into account and sent the letter to not only Kohn LP-1 clients but to Kohn LP-33 clients. There were resulting lawsuits and problems due to this letter.

369. Testaverde refusal to discuss the information and the fact the limited partners were not his clients ( Litwok was his client) was of concern. Litwok and Litwok's attorney's believed Testaverde had other "motives". In fact, more of Testaverde actions started to come into question. It was found out that Testaverde met with one of Litwok's investor's attorney back in January 1996. Testaverde inappropriately met with the attorney, Corey Winograd while working for the fund.

370. All the documents surrounding the events of the Testaverde letter are in the possession of the SEC. The SEC had the correspondence between Testaverde and Litwok's attorneys. His unilateral, unethical, sloppy, irresponsible and fraudulent actions should be but is of no concern to the SEC. There 2.37 million dollar number provided by Testaverde to the SEC is false. In spite of the inaccuracy of his report and the SEC knowledge about the inaccuracy, these government employees continue to use the Testaverde information.

371. The sending out of the letter to the Kohn clients was illegal. They were not his clients. The sending out of a letter claiming Litwok might have taken in excess of 2 million dollars shows no professional standards of conduct. His firm, Goldstein Golub Kessler will be held accountable for his actions as he is a partner as the firm. Testaverde did not care he was showing one side of the balance sheet. He had no knowledge of deposits and this was a criminal act. The SEC and the U.S. Attorney's office have begun no investigation why this false letter was sent out. Perhaps Testaverde was helping someone with the Republic case. For a ten year partner of Goldstein Golub Kessler, now American Express, to write a damning letter which was based on information he knew to be false was criminal.

372. Peter Testaverde was deposed several times beginning in 1998. In all of the depositions, the SEC questions Testaverde about his communication with Litwok around the time of his August 16, 1996 letter. Testaverde claimed to have spoken to Litwok before he sent out the letter.

373. Exh. 64 is the letter from Lesser to Testaverde. Litwok's attorneys are pleading with Testaverde to speak or meet with Litwok before sending out the letter. Litwok's attorney's had faxed the numerous "unindentified " deposits and wanted Testaverde to look at them.

374. Testaverde refused to look at the deposits and refused to talk to Litwok. Testaverde claim that he spoke to Litwok is not true.

From Litwok's attorney " nonetheless, we still suggest that rather than transmitting your letters to the limited partners, you instead meet with Ms. Litwok at your earlier convenience to review the documents she has previously transmitted to you concerning the account".

The government has the correspondence between Lesser and Testaverde. Lesser could not get Testaverde to talk to Litwok. Therefore Testaverde sworn testimony about speaking with Litwok is false and perjured.

375. Matthews deposed Testaverde in April of 2003. During the course of the deposition, Matthews asked Testaverde about conversations with Litwok.

P.56 Q: Did she (Litwok) provide you with any explanation as to why there might have been excess compensation withdrawn?

TESTAVERDE CALIMS TO HAVE SPOKEN TO LITWOK REPEATEDLY IN JANUARY THROUGH JULY OF 1995 WHEN HE DID NOT ENEN KNOW HER

A: Well, we had conversations at the time of withdrawals were made, the firm was profitable. And therefore, if you look at it literally, if you take –if the firm is profitable, let's say up until , pick a date and the general partner is entitled to that 20% share, then it wasn't excess compensation at the time it was taken. It became excess compensation because later on in the year.. it would have been allocated back to the other partners."

376. SEC attorney Matthews was told there was no misappropriation of $3,000,000 million dollars. She and Markowitz chose to conceal this fact. Like Troncoso and Chovlovsky before, all SEC attorneys heard that money was taken when the firm was profitable and refused to change the use of the word "misappropriate $3,000,000 in their claim. For 8 years Litwok had lived under the cloud of "misappropriation of $3,000,000 million dollars".

377. More disturbing was Matthews's failure to act on what she knew to be the lies of Testaverde. When Testaverde stated "he spoke to Litwok at the times of each withdrawal" meant Testaverde would have to have known Litwok from January through July of 1995 when the withdrawals were taken. Matthews knew instantly this was a lie and looked right at Litwok. Following the session, Litwok spoke to Matthews and said "You do realize Testaverde just said he knew me prior to July of last year, yet Exh. 62 is when Testaverde himself stated he met Litwok.

378. The government brought no Investigation of Testaverde or Goldstein Golub Kessler/ American Express. The government did not charge Testaverde with perjury. The government did not investigate what motivated Testaverde or his firm Goldstein Golub Kessler to send out the August 16 letter since he and

or his firm might have had a reason to help Republic win the case. Litwok had not spoken with Testaverde in 8 months. No one in the government found Testaverde actions to be criminal.

379. Testaverde also stated in each of his depositions he told Litwok to pay back the money. Testaverde lied when he stated to told Litwok to return the money. His retainer agreement calls for a tax return and an audit. His role is limited to the tax return and the audit and he did not perform those functions. He did manage to disrupt and cause lawsuits to be filed.

Testaverde was and is incompetent. Testaverde signed off on a letter without knowing who made deposits into the fund. He didn't realize Litwok had already paid back the fund a significant amount Between 1995 and the time of his first deposition in 1998, Testaverde didn't bother to check his work- where are his supervisors). As of 2003, he was still stating, Litwok should have paid back the money ( not his job). If he had done a proper examination of the fund, he would have known Litwok had paid the fund most of the money. Testaverde was negligent in that he had no right to make any statement without a full knowledge of all the accounts. It's not only unethical but actionable.

380. The government also chose to ignore Testaverde private meetings with investors which resulted in lawsuits against Litwok.

381. The government wants to conceal this evidence because the additional lawsuit against Litwok makes her look guiltier. It is to the advantage of the SEC that the story of investor Berkowitz stays out of the picture. This way, the SEC can discuss the Berkowitz default instead of the truth underneath the default.

382. The only retainer agreement Litwok and Kohn had with Testaverde was to do the taxes and audit of Kohn LP-1 and Kohn LP-3. Testaverde sent a copy of the November 3 report to attorney Corey Winograd, Both Winograd and Testaverde knew that the contact should have been made through Litwok. Both are professionals and know the rules. Testaverde had no business dealing directly with Winograd.

383. Without Litwok's knowledge, Testaverde had a meeting with an attorney for Berkowitz, Corey Winograd, and two accountants. This meeting occurred in January of 1996. Litwok was not invited to participate in this meeting.

384. Berkowitz was an investor in Kohn LP-1 who put 3.3 million into the fund and received 11.6 million in July 1995. He walked away with a profit of over 8 million dollars.

385. Two weeks after the report came out and Corey Winograd , Berkowitz's attorney came into the picture, Litwok was asked to give Berkowitz an additional 167,000 ( Exh. 67)

385. Corey Winograd remained in close contact with Peter Testaverde and met with him and two accountants in January 1996.

386. Litwok didn't know about the meeting until she received a phone call from Helene Netter telling her Berkowitz was owed yet additional money. Litwok quickly looked at the numbers and realized the general partner had never been paid their 20%-40% portion and Testaverde had made a serious error.

386. Testaverde, in a breach of contract, provided Winograd and the two accountants, Barry Berkowitz and Jerry Katz, with all Goldstein Golub working papers.

387, According to the testimony of Barry Berkowitz, Testaverde made a presentation to Winograd and the accountants about the general partner (Exh. 66)

388. The two accountants, Barry Berkowitz and Jerry Katz, were deposed. Testaverde told B. Berkowitz and Katz about "withdrawals Litwok made out of the fund". Testaverde provided them with information to sue Litwok. Testaverde instigation the lawsuit against Litwok.

389. Testaverde had Litwok pay an additional $167,000 and looked for her to pay an additional $400,000. In depositions with the SEC, Testaverde was asked to calculate how much Berkowitz was owed. Testaverde came up with 4 different numbers.

399. Corey Winograd filed a law suit against Litwok on the same day as Litwok filed a law suit against Republic. He did this is spite of the fact that Litwok showed Winograd that when Berkowitz took out the 11.6 million dollars, the general partners 20% was never taken out. Litwok had repeated conversations with the smirking Winograd.

400. During Testaverde depositions, he was asked to calculate how much money was owed to Litwok as a result of Berkowitz failure to pay the general partner. Testaverde response was 2 million dollars. The SEC was at this deposition and aware of this.

401. Testaverde falsely and fraudulently testified Berkowitz was owed money.

402. Testaverde is a ten year partner at Goldstein Golub/ American Express. In one deposition he states he is responsible for 35 clients and in another deposition, he states he is responsible for 70 clients.

403. It is hard to believe, Testaverde, a partner of a major accounting firm would "forget" to pay the general partner, order the partner to pay additional funds, hold private meetings with a clients client (and his attorney), encourage a lawsuit against Litwok and them write a letter to not one but the clients of two funds (50 people), take phone calls from the clients after he resigned and tell his client clients that Litwok owed the fund money.

404. It is also hard to believe the SEC who saw the 2 million dollar error made by Testaverde with Berkowitz, and who heard Testaverde be unable be identify the roughly 2 million going back into the fund in the fall of 1995, would not change their mischaracterization of the
appropriated" $3,000,000.

405. Testaverde testimony is false and his behavior is both unethical and calculated. A person in Testaverde position has to calculate the general partner's portion.

406. Testaverde has never corrected his testimony and the SEC has not withdrawn his testimony.

407. The Berkowitz lawsuit, the Testaverde letter, all helps serves the SEC case. The SEC is obligated to Litwok through the Constitution that these facts are checked out. The SEC is obligated to provide full disclosure of what they find out and to provide Litwok with due process. The government employees have used the letter and the Berkowitz matter with each client deposed to their advantage.

407A. Corey Winograd knew Berkowitz never paid the general partner the amount owed to the general partner and still chose to file a lawsuit the same day as Litwok filed against Republic. Litwok personally showed Winograd the mistake as did Ted Lackowtiz and Winograd filed a fraudulent lawsuit. Berkowitz owed Litwok money, not the opposite. Winograd, knowing Litwok was embroiled in the Republic case attempted to exploit the situation.

408. The SEC instead of withdrawing false information used the Testaverde and Berkowitz information against Litwok. Every single deposed person was asked by Cynthia Matthews about their knowledge of the Testaverde and Berkowitz matter. Matthews and Markowitz knew Testaverde had made two

large mistakes; 1) he didn't know the deposits and 2) he overpaid Berkowitz by 2 million. In spite of knowing these facts, Matthews used these two cases two her advantage. This is a violation of her ethical oath and of Litwok's Constitutional rights.

407. The SEC employees left out "material facts" because it was to their advantage to do so.

408. None of these so called "material facts" were ever altered by the Northeast region of the SEC, the U.S. Attorney office or the IRS.

409. The reason the government employees still hold Testaverde in good standing may lie in his 1998 deposition testimony.

410. SEC attorney's Troncoso and Chovlovsky asked Testaverde "have you previously testified at any investigation conducted by any other federal agency? His response "I testified at the Grand Jury as a government witness. The SEC "and that was in the Ivan Boesky matter?"

411. It appears that Goldstein Golub does not employ Testaverde for his mathematical skills, but for his ability to "testify".

MORE ON THE MARKOWITZ LETTERS

412. In the October letter from Exh. 52, Markowitz twists and turns the facts. In addition to his "by way of background" and the stealing of the "$3 milllon dollars" and "*taking more than a year to answer*", Markowitz lies about one more thing.

413. In the first paragraph, he states, Litwok is seeking a stay of all discovery in this action pending the resolution of an UNREALTED CRIMINAL ACTION.

414. There is nothing unrelated in this entire case. If Markowitz thinks the insurance portion is unrelated, then he fails to tell the court the key witness for all case is non other than Dalia Eilat. The person who helped conceal evidence on the insurance case is Postal Inspector Sol Farash who also contacted the Investors of the funds and encourages them to send in letters. Farash also offered to provide subpoenas. This is not the TV show 6 degrees, This and these cases are entirely related. Who is Markowitz kidding?

415. As further proof Markowitz statement is perjury, Markowitz told Litwok if she lost the insurance case, the SEC would not have to go forward with theirs. If convicted on the insurance charge, the SEC wins their case

automatically. He said this with a smirk. Markowitz knows exactly how these cases are interrelated.

416. This October letter contains one sentence with 3 lies- it is the TRIPLE CROWN OF MARKOWITZ PERJURY AND LETTER WRITING.

417. The stay of the proceedings is already mentioned. The second referres to the various stays which Litwok requested. This is a lie, because the delays were SEC delays. The third part of the sentence involved another "much used phrase" by Matthews and Markowitz, "IT WOULD PREJUDICE THE COMMISION".

418. If the SEC spent the first two years asking for delays then it is a lie to claim any prejudice to the SEC. Litwok's civil rights were violated by the limited investigation, the irresponsible behavior and the continued insistence to Judge Irizarry in 2006, Litwok is responsible for 4 years of delays.

419. The SEC is still trying to blame Litwok for delays of 4 years even after Judge Lindsay stated in 2004, "You can't lay the delays on the defendant".

AGING DEFENDANTS

420. On January 29, 2003 ( Exh. 67) Markowitz, Rosenfeld, Moore and Rahkover submitted a Memorandum in Opposition to Litwok Motion to Stay the Proceedings.

421. One of the arguments the SEC makes is "the commission would be prejudice ( that word again) because it needs to take the depositions of aging witnesses.

422. The Commission filed this case on 12/27/2000 and could have started the process of depositions in those 2 years. The three month stay was the first "stay" in the case. No one was preventing them from starting the process.

423. The SEC witness list had over 17 witnesses above the age of 70.

424. The stay was lifted and the SEC was in no rush to depose the "aging clients". In April 2003, they deposed their first and only one aging investor before discovery was closed.

425. The excuse of the "aging witnesses" was a fraud on the Court. In lifting the stay Litwok was forced to deal with the Criminal case at the same time as the SEC case. The SEC had no intention of preserving testimony of the "aging witnesses" since they only called one investor and that came three months later.

426. By using a lie to open the stay, the SEC violated Litwok's civil rights.

427. By way of background "the aging witness issue was only brought up by the SEC for the first time when Litwok requested a stay in 2003. It took them three years to think up this up this angle.

428. The Memorandum refers to a 77 year old woman whom the SEC needs to depose. When Winnifred Borg was finally deposed in April, she was asked the question "did you have a companion during 1997". The 77 year old aging witness replied, oh no, it was not a relationship, I just used him for sex". I seriously think the aging witness issue should be re-thunk by the SEC.

429. From the 2003 deposition, Matthews and Markowitz could see the aging witness was quite "feisty". Yet in 2004, Matthews still refers to her as "elderly" when speaking to Judge Lindsay.

*********************************************

THE REALTIONSHIP BETWEEN DALIA EILAT AND THE SEC

430. Dalia Eilat was listed for several years as a "relief defendant" when in fact she was working closely with the SEC on the case against Litwok.

431. The SEC had no intention of prosecuting Eilat but needed her as a witness in the case.

432. In April 16, 2003, Eilat was to be deposed by the SEC. Litwok, her attorney and the SEC were waited for a few hours for Eilat to show up when they received notice that Eilat would not be appearing.

433. Eilat did not testify till July of 2004, approximately one year and three months later. The tirades Markowitz and Matthews use on a weekly basis ( in their letters) were barely a whimper when it came to Eilat.

434. There was no outrage as there was with Litwok and no campaign to compel Eilat to testify. It was within the SEC power to do so. Given all the aging witnesses and the Litwok delays, you would expect the SEC to be putting in motions to the bankruptcy court and this court to compel Eilat to testify. This did not happen.

435. This case was never going to close without the testimony of Eilat and all complaints, accusation and charges about the Litwok delays are false. Between 2003 and summer 2004, the SEC was in no hurry to have Eilat testify. Even when they repeatedly tried to make it appear it was Litwok's delay, this case was not pushed by the SEC.

436. Eilat was being protected in many ways by the SEC. This was a violation of Litwok's rights. The SEC presumed Eilat innocent and Litwok guilty and never investigated otherwise.

437. Their presumption of guilt led to other violations to Litwok. On April 25, 2003, Eilat's counsel, Sarna withdrew from this case as Eilat's counsel ( Exh. 68).

438. In the status conference of December 16,2004 (Exh. 35/p.40), Judge Lindsay stated " Sarna has not appeared in this case, he doesn't represent her. In fact, he (Sarna) made a point of saying to the Court way back when... under no circumstances were I (judge Lindsay) to interpret that as being an appearance in this case. Markowitz and Matthews ( M & M) knew at all times it was improper to have Sarna still remain a part of this case after April 25, 2003.

439. Markowitz and Matthews kept Sarna in the loop by copying him on every document. The invited him to every depositions. This was not proper nor legal.

440. After Eilat's bankruptcy was discharged and Sarna no longer represented Eilat, the SEC let Sarna participate in the deposition of Dalia Eilat. They did this to protect their witness from saying anything that would hurt their case. Sarna should not have been part of Eilat's deposition. During Eilat's several days of depositions, Sarna answered most of the questions from Litwok's attorney. Sarna interrupted and made sure Eilat made no mistakes.

441. Eilat was so confident with her position she was rude to Litwok's attorneys often making comments like "look it up yourself". This amused M & M of the SEC.

442. Matthews and Markowitz violated Litwok's civil rights and her right to due process by letting Sarna into their deposition. They knew exactly what they were doing. They wanted to play with a "fixed deck" and they did.

443. Litwok and her attorney asked the SEC for Sarna to leave. M & M responded by making light of it and saying it was ok with them. Being ok with them is not their right. This defendant was Pro Ce and should have been questioned alone.

444. Additionally, Litwok pointed out to the SEC that in the bankruptcy filing of Eilat there were numerous lies. Eilat listed no licenses, yet had licenses for both real estate and architecture ( Exh. 69).

445. The day of Eilat's appearance for her deposition April 16, 2003, when she said she was unavailable because of the Jewish holidays, Eilat was at the real estate firm of Fenwick Keats, signing up as a contractor ( Exh. 70)

446. The SEC did not care about the numerous fraudulent statements made in the bankruptcy by Eilat. Eilat's cooperation agreement with the government disallows her from making false statements. Eilat's history is replete with false statements.

*************************************************************

EDWARD SAPONE

447. A very strange thing happened with Litwok's discovery and depositions.

448. Litwok worked with attorney Sean O'Shea for 5 years preparing all documents, all discovery requests, and all depositions to be taken.

449. Litwok's father died suddenly on January 31, 2002. Without the help of her father, Litwok needed to find a less expensive attorney.

450. Sapone, through a friend of Litwok's. agreed to work on the entire case for a flat fee. This did not include taking the case to trial.

451. Sapone entered the case in June of 2002 . He was given all discovery demands for the SEC, for a list of other people, a list of depositions and a copy of all documents provided to the SEC in 1998.

These documents, some 20 boxes represented all Litwok had already given to the SEC.

452. Sapone was given the task of asking for a Jury trial and expert witnesses.

453. In March 2003 Sapone noticed the court of some discovery requests and some depositions (Exh. 71). Sapone did not copy LItwok on documents as did O'Shea.

454. Discovery was to close on July 16, 2004. Sapone had submitted noticed the court in March of 2003, but Litwok had received no schedule for depositions or documents from Sapone.

Litwok inquired about the deposition schedule, the documents from the SEC, documents from the complete list and was told "everything is ok and everything is being worked on".

Litwok kept inquiring about the deposition schedule for Litwok's list. Fax lists went back and forth between Sapone and LItwok ( Exh. 71A). In spite of

their financial agreement, Sapone requested and received additional funds. Litwok doubled the amount of money Sapone received.

455. Litwok paid for all expenses for the traveling to Florida for depositions. In July of 2004, Sapone asked for two additional checks 5,000 and 5000 which he received.

455. Sapone told Litwok he had taken care of everything, but Litwok knew the depositions were not prepared because she had no schedule.

456. On July 15, 2004, following Eilat's deposition, discovery was closed.

457. Sapone sent out discovery requests on July 12, 13, and 14. None of the discovery requests could have come back in time for the July deadline.

458. Sapone was still assuring Litwok the depositions would be going forward when on August 4, 2004, Litwok received a copy of a letter to both courts asking to be relieved of the case ( Exh. 71B).

459. The only person who appeared to know Sapone was both not doing deposition and leaving was Cynthia Matthews. Matthews testified to Judge Lindsay she was aware that Sapone would not be taking depositions.

460. The fax dates between Sapone and Litwok show this not to be true.

461. The sudden departure of Sapone left Litwok with : 1) no discovery. 2) no depositions, 3) no jury trial 4) no request of documents from the SEC and 5) being in the middle of expert discovery requests.

462. Litwok was caught off guard by Sapone's abrupt leaving. Given she had just given Sapone an additional 10,000, she had no explanation.

463. Sapone's letter of application to withdraw states reasons for his leaving. It is contrary to the relationship Litwok and Sapone were having at the time of his withdrawal. Litwok was helping Sapone to decorate his office, helped pick out his engagement and wedding ring, and was actively working on a case for Sapone. The reasons listed in the withdrawal application were not accurate given the nature of their relationship.

464. Litwok had no idea where to pick up or what to do. In the first meeting with Judge Lindsay after Sapones withdrawal Litwok was asked one question, do you want an expert witness. Litwok quickly and without thought said no. Litwok did not understanding the implications of losing Ted Lackowitz as an expert.

465. Litwok had already approached the U.S. Attorney and was actively involved in preparations for meetings with them. The one minute conversation about Ted Lackowitz was done without proper knowledge or any guidance.

466. Sapone had worked as Litwok's attorney for two years and suddenly disappeared and left the case seriously damaged. Given Sapone had all documents needed to do discovery and depositions, and given he was paid twice more than he expected to get, there is no explanation why he would leave following the closure of discovery. There is also no explanation for why he would jeopardize a case for which he was paid in advance for the discovery. All Sapone had to do with regard to discovery was have it properly typed and served in a timely fashion.

Having spent 7 years working diligently on this case, Sapone put Litwok in an untenable position. There was no financial reason.

467. The only people to benefit from Sapone not doing the discovery, depositions, expert witness and SEC document request was the SEC. Litwok would be left with no independent information.

468. Sapone showed no signs of leaving Litwok until discovery were over. Since the SEC is the beneficiary for Sapone's leaving, Litwok is investigating the matter to see if there are no ties between Sapone and the government employees.

469. Litwok believes the timing of Sapone's leaving is not an accident. Litwok also believes Matthews and Markowitz had something to do with his leaving.

---

LITWOKS DEPOSITION

470. This 8 years has been an experience in the total lack of "due Process". The SEC acted so unilaterally and never allowed for FAIRNESS in this case.

471. Litwok had no attorney after Sapone left. Prior to her deposition, Litwok realized she couldn't be cross examined and asked Matthews and Markowitz for time for her to read a statement into the record.

472. The SEC put her through three long days. One evening's deposition ended after 9:00 p.m.

472. Prior to the first day of her deposition and on the record, Litwok asked for and hour and a half to speak. Matthews and Markowitz agreed.

473. On the second day of her deposition, Litwok reminded Matthews on the record she needed her one hour and a half. By the third day, evening was approaching, Litwok asked Markowitz to stop her examination so Litwok could proceed.

474. Matthews and Markowitz had no intention of giving Litwok the opportunity to speak and did not. In effect, Litwok was not cross examined and never laid out her side of the story.

475. Litwok repeatedly asked Matthews to schedule the time and Matthews never offered a single time. This is the trademark M & M way of operating, accuse Litwok of being non responsive but in real life, it's the M & M "staff"" that are cut throat, ruthless and play with a different set of rules.

476. Matthews took close to 29 hours of straight testimony and never intended to stop to give Litwok time to talk. The SEC can only win this case if the "facts" of the case are left out or if they cheat. Cheating is all they have done. At no time did Matthews, through faxes, phone, writing, make any effort, to provide Litwok with her time.

477. Since Sapone failed to make a request for the SEC's documents, Litwok was allowed to go to the SEC to look at the documents. If you read what Matthews and Markowitz said about how much trouble and expense they went to make the documents available, you might be convinced. Here again, they are lying.

---

THE UNAVILABLITY OF THE AVAILABLE SEC DOCUMENTS & HOW THE SEC MANAGES TO MOVE $ SWITCH THE BOXES ALL THE TIME

478. Litwok had a standing time to come to the SEC; the time was 10:00. Matthews was aware of the time. Litwok had to register in the building and the building would then call up to the floor to let them know Litwok was in the building.

479. Once on the floor Litwok signed into official time sheets ( the downstairs had official time sheets too). There were two officers and an administrative assistant on the SEC floor. If the time sheets were made available and their testimony was available, they would tell the court that Litwok waited for Matthews for over an hour on each trip.

480. Both the SEC and Litwok changed dates on each other, but the SEC claimed only they were stood up. Faxes and phone calls say otherwise.

481. Matthews told the Court this set up involved a huge expense. According to SEC staff sitting with Litwok, staff was notified either that day or the day before by email schedule, the morning Litwok was coming. Matthews would send a staff the hourly breakdown of who was to come when. No response was required. They were to show up at the room.

482. Prior to the SEC move to the World Financial Center, Litwok had set aside ten boxes to be copied. Each box had tags marking the pages to be copied. Not surprisingly, Litwok's tags were removed, boxes were changed around and Litwok had to re-review the boxes again.

483. Litwok was only able to go through 3 boxes a day. This meant she lost three days of work.

484. The 40 boxes shown to Litwok did not have everything the SEC had in its possession. Matthews intentionally withheld documents. When Litwok asked for the documents, Matthews provided them. The SEC intended to make this process as difficult as possible.

485. On two occasions, there were only a few boxes in the room. Matthews could not be found and Litwok had to leave after lunch. Coming from Central Jersey, the trip was long and expensive. Loosing two days for a big expense for Litwok.

486. In the berating letters of M & M, they often to refer to the work and effort they went through to provide the documents. SEC employees on the floor and sitting with Litwok in the room, if not threatened, would tell a different story.

DEPOSITIONS AND ANTI-SEMITISM

487. Litwok requested 4 hours for each deposition. The three Florida depositions were a tremendous expense and Litwok wanted enough time to depose. The SEC never gave Litwok the amount of time requested. The SEC never gave Litwok the amount of time she requested. They didn't care and never scheduled the enough time for Litwok.

488. M & M knew that Litwok's parents were survivors of the Holocaust. They did not know Litwok's parents spoke to high school students all over the state

of New Jersey about their experiences in the war. They have won many awards, including one from Elie Wiesel.

489. This heritage is a proud and important one for Litwok. Litwok is part of the Second Generation ( 2G) movement of children of survivors. Their goal is to make sure what happened to Jewish people doesn't happen to anyone again ( Exh. 72) This is a very important part of Litwok's life.

490. Since the 70's Litwok has spent the bulk of her time as a "social activist". Her activities are well documented. Those activies have been a constant part of her life at all times.

491. In the depositions, Matthews brought up the Holocaust to only the Jewish clients. Matthews did not ask all the deposed clients if Litwok had discusses the Holocaust with them. She asked some Jewish clients and the questions were framed in a highly were anti - Semitic way.

492. During the depositions where Matthews attempted to insinuate Litwok was using the Holocaust to manipulate the clients, Litwok stopped the questioning by telling Matthews she was being anti - Semitic.

493. It is a violation of Litwok's civil right to use her religious background against her. Matthews has no right to bring in the Holocaust or anything relating to Litwok's Judaism.

494. More recently, in 2006, Matthews made a motion dated on Rosh Hashanah, the holiest holiday for Litwok, It was due back ten days later on Yom Kippur, the end of this holiday. Matthews knows Litwok is an observant and traditional Jewish person. This document could have been sent months earlier or later. The fact Matthews chose to send it out on the only time, Litwok could not work on it shows this court the disrespect she has and to what extent she will go to avoid due process, fairness and Litwok's civil rights.

*************************************************************

MATTHEWS LETTERS FILED WITH LIES

495. Rather than go through Matthews letters in their entirety, the September 22, 2006 letter will be used as an example of how Matthews, like Markowitz just "makes it up" (Exh.73).

496. Matthews writes to the Court to advise that defendant Litwok has failed to comply with the Courts August 10th,2006 order requiring her to serve the Commission with an exhibit list. Matthews would have the court believe Litwok never provided lists or documents to the SEC,

497. Litwok emailed a list and at Matthews's request, put the list and documents on a CD disk. Matthews claimed it would be easier for the SEC to work off a disk rather than integrate copies of often duplicated items.

498. Exh. 73 is the letter referred to and some of the e-mail sent between Matthews and Litwok a year earlier. Matthews is also implying that the March 31 documents sent to the court by the SEC is a product of the SEC only.

499. Matthews adds that Litwok is in possession of a document for 6 months without the SEC having nothing from Litwok. This constitutes "a prejustice to the SEC" ( the prejudice to the SEC is part of the SEC handbook for what to put into letters).

500. By implying Litwok was not part of the preparation and providing Matthews with nothing is fraud and perjury. To tell the court this story is prejudicial to Litwok. The e-mails tell a different story. There are also several hours of phone conversations where these documents were discussed.

501. It is an outrage that Matthews tries to convince the court Litwok didn't participate. Litwok's sincere hope is the government employees, Matthews, included, be disbarred for their lack of any kind of ethics.

*****************************************************

THE SEC CASE AND THE U.S.ATTORNEY CASE

502. Throughout this claim, Litwok has tried to show that due process have been repeatedly violated. Litwok's constitutional right have been violated. The SEC, the IRS and the U.S.Attorney have evidence which they have either chosen to withhold or conceal in order to make their respective cases.

503. The websites of both the SEC and the U.S. Attorney's office contain ethical standards for operating. The government employees have met none of the standards of their own offices. Even worse, they have been deceptive, have committed perjury, fraud and behaved in ways, other people would be disbarred, fired and arrested.

504. For close to 9 years there has been no accountability for outrageous actions. Litwok has been spoken to and treated like a criminal. Litwok has been intimidated and harassed. This on top of her civil rights being violated. The government employees act as if they are above the law.

505. In the SEC case, it is stated, Litwok misappropriated 3,000,000 million dollars- Hours of depositions prove this is not true.

– In the SEC case, it is stated, Litwok gave her live in companion 1.3 million dollars, this is not true

–in the SEC case it states Litwok had 3 funds– this is not true, Litwok owned Kohn LP-1. Eilat owned Kohn Lp-33 and Kohn 11 was never organized

– it states Eilat and Litwok were live in lovers– this is not true

In the SEC case, the SEC states,

–Litwok made material misrepresentations to investors concerning prior history– this is not true. The prospectus encourage people to ask me any questions they wanted to.

- the SEC knows disclosure in an unregistered fund is not required. Their transparent attempt to make it " a registered " fund is not possible
- – the SEC states that as a result of her misconduct, investors have lost millions while Litwok enriched herself.
- Investors received 17,000,000 million dollars in return of principal and profits. More than 12,000,000 was pure profit.
- 2 million dollars was lost in trading and Litwok returned close to 2 million dollars.
- Litwok did not enrich herself, at the time the fund was profitable, Litwok took less than she was allowed to take
- the SEC states Litwok lost the funds in high risk trading. The funds prospectus states the fund was a high risk on page 2 of the document
- the clients of the funds knew what they were getting into ,; during two depositions, both clients understood the risk but did not want the result
- For Example:
- Ileen Gottlieb ( Exh. 74) P.101
- Q: why did you want Litwok to go to Jail
- A: she swindled me out of 1 million dollars
- Q: how do you know she swindled you out of a million dollars
- A: she took my money as I sent it. I was responsible for sending it. She is responsible for losing it
- Q: so when you say she took your money, do you mean she lost your money
- A: Yes
- Q: IN trading?
- A: Yes
- Q: Didn't you agree to send her the money– wasn't it for the purpose for her to trade the money. To trade and then try to earn money through investments
- A: Yes but not to do what she did

- Q: what did she do
- A: I think she lost it in one day, one hour whatever she did, she didn't do it like a trader does it in my eyes
- Q: what do you mean
- A: Well I had Investments before I met her . When I sent money to them they didn't take that money and Immediately lose it.... I mean lose a little bit this months and maybe a little bit next month. I didn't lose a million dollars with any of my brokers in 4 months.

Gottlieb knew the money was lost in trading. Gottlieb knew the risk of trading. She felt "Litwok" lost too much". She was angry but there was "No Mispresentation".

Janet Davis (Exh. 75/P.51)

Q: and what was your understanding of Ms. Eilat's role in Kohn Lp-33

A: She was the president of the company which allowed her access to the funds of the company.. she was not the investor

P.59 Q: Isn't the reason you received no money back was because it was lost through investments?

A: I don't know how it was lost. I cannot say to you it was lost through Investments. I cannot tell you know it was lost. I believe she put the money elsewhere. That it is offshore...

Q: did she tell you it was stolen

A: there is no record of this

P.70 Q Now you said there came a time where you had conversations with Litwok where she told you that the investment was- the money was being lost

A: she said it was being lost

A: she said the account was lower, each time she said the account was lower

P.97 Q: you knew that investment was a risky one didn't you?

A: Risk is different than total wipeout. totally losing

A: I had other investments that were risky... Risky was never to lose . Risky was a slight drop[. Risk would never be losing all my money. Risky was a question of depreciation, not a wipe out.

Q: Did you believe at the time , that your investment in this fund was a risky one, yes or no

A: a wipe out no

Q: can we agree that you're upset because you didn't earn the money you wanted to earn?

A: no I am upset because she stole my money

505. Both these clients were interviewed by the SEC and Postal Inspector Sol Farash.

506. The SEC case in fact is not factual and not "material". The SEC has evidence to the contrary on each and every point.

- unknown deposits
- authenticated transfers of 1.3 million from Eilat to Eilat
- A 1995 tax return claiming the money as Eilat's

- Testaverde unexplained activities
- The re-edited tape by the government and Haveles
- The Berkowitz case where the client who made 8 million was overpaid by 2 million

507. The SEC had an obligation to ask why their evidence had so many problems. The SEC, the IRS and the U.S. Attorney's office are obligation to provide Litwok with due process, a fair review of the evidence. They are obligation not to commit fraud, not to perjure themselves and not to obstruct justice.

508. These government employees plus several lawyers involved in aspects of this case all disobeyed their oaths and in so doing, they violated Litwok's Constitutional rights.

509. These government officials are obligated to a higher standard than lawyers in private practice because they serve the public interest. In the case of Litwok, their interest was to prove guilt, to limit the scope, to ignore information contrary to their theory of the case.

510. Those non government lawyers are sworn by their state and ethical rights. Testaverde is obligated under his professional rules of conduct. The underlying cases- Republic, Berkowitz, Testaverde, that help make up the government's case were and remain part of the problem of professional misconduct and fraud.

511. The SEC has repeated lied to the Court. During the November and December meetings of 2004, Matthews and Markowitz said the following

- Your Honor, we have been trying for four years to bring this case to a conclusion
- Ms. Litwok has delayed at every turn
- At the heart (Markowitz) of this is that the SEC has been litigating through facetious litigation practices through four years.

512. During the December 16, 2004 conference, Judge Lindsay thought it"was necessary in light of the submission from the SEC to make sure the record is clear because the submissions from the SEC suggests, and I want to make it clear I disagree with their suggestion, that this case was dragged out by the Defendant as part of a delay strategy or some kind of tactic to mislead. I don't see any of that in this case. And for that reason I want to go through

the record because while the SEC charges that there has been inappropriate or undue delay, I don't really see it the same way."

513. Judge Lindsay concluded – you can't lay this one on the Defendant.

514. In April 2005, Litwok became medically disabled. In spite of having two surgeries, a loss of hearing in the right ear, a lump on her breast, serious back pain ( which now requires surgery), Litwok continued to work until she could no longer work.

515. Litwok participated in 10 depositions and her own deposition. By June of 2005, she required two surgeries and still had an unknown pain.

516. Litwok did need an adjournment in 2005 and never received the time to be properly diagnosed. The back problem from April 2005 was not dealt with and now requires surgery. Had it been dealt with in 2005, physical therapy and pain management may have cleared it up.

517. During the writing of the Pre Trail Order, Litwok who normally works 16 hours daily and is very focused, could not focus and had severe short term memory loss. Doctors verified this to the Court but no adjournment was permitted.

518. By the fall of 2005,Litwok was unable to move out of her bed. Her blood level indicated Severe chronic fatigue syndrome. Upon examination, she was diagnosed also with Fibromyalgia. All doctors' orders were to stop work immediately and rest. Stress was the likely cause of the severe chronic fatigue and Litwok was ordered to stay away from stress.

519. Once Litwok's body went into a condition of severe chronic fatigue, "there was no quick fix". She could not work , she could not focus, and she was in physical pain from the fibromyalgia. Because the court failed to adjourn the case in 2005, Litwok became medically disabled.

519. To make matter worse, Judge Lindsay moved the case to Judge Irizarry's court room.

520. JUDGE IRIZARRY OPENED LITWOK TO A WHOLE NEW DIMENSION OF DISBELIEF AND MANAGED TO DO SO .... IN ONE AND A HALF HOURS.

Prior to talking to Judge Irizarry, Litwok's exposure to female Judges was TV interviews of retiring Judge Sandra Day O'Connor and Ruth Ginsberg. In a recent interview, Judge O'Connor was talking about the importance of the Judiciary remaining independent.

521. Litwok would agree with Judge O'Connor if all justices were like Justices O'Conner, but, Justice O'Conner had not been in the court room of Dora L. Irizarry. She is the queen and champion of threats, screams and bullying. **Litwok had sent a complaint to the Second Circuit regarding the temperament of Judge Dora L. Irizarry.**

522. From the first few minutes of the February 23, 2006 conversation, Judge Irizarry treated Litwok with contempt and disrespect. Between the conversation that day and the short follow up on March 1, 1 and ½ hours, Irizarry, threatened to have Litwok picked up by Marshals, called her an obstructionist and treated her like the guilty party.

Litwok asked the Judge to recuse herself by letter and by motion and Judge Irizarry never responded. A copy of both requests were sent to Chief Justice Korman ( Exh. 76).

523. Judge Irizarry did not respond in writing but responded to Litwok orally. Judge Irizarry's behavior was threatening and harassing. Litwok was tempted to ask her if the Judge thought the court was in a Communist country.

524. Following the conversations and Litwok's motion for recusal, Litwok googled Judge Irizarry and found the American Bar Association was against her appointment as a Federal Judge because of problems with her temperament ( Exh. 77).

525. The minutes from the conversations speak for themselves ( as the SEC is so fond of saying) The following are comments made by Judge Irizarry in this brief hour and a half (Exh. 78)

- my patience is running thin and I am about to send marshals out to your house to pick you up (this was 10 minutes into the conversation)
- you've cause this case to be delayed 5 ½ years
- You have requested adjournment after adjournment
- You are attempting to slow proceeding down
- You never do anything on time

*** If you fail to comply with the schedule sanction will be imposed. You have a history of not complying. Sanctions will be imposed including the possibility that certain exhibits not be included– do you understand me?

*******with regard to summary judgment

" with regard to Litwok request for time for summary judgment, the first issue that concerns me is " you never do anything on time. That you would write a frivolous summary judgment and if I find out it was frivolous, it would not prevent me from imposing sanctions on you for filling a frivolous motion especially with your history of obstructing the case"

Judge Irizarry, seems to have profoundly failed. Litwok gives her a "F" for reading the Litwok case file. Litwok, even by the M & M team, has diligently and intensely worked on this case at all times. Only in 2005 did her health begin to fail her. Judge Irizarry did no and could have not read Litwok's file at all and therefore Litwok holds her accountable for seriously irresponsible statements. These irresponsible statements are the "homework" of a Federal Judge and unacceptable in her line of work. If Judge Irizarry does not have the time to read the file and know the information, it is time for her to step down. She is disrespecting the office of Sandra Day O'Conner and Ruth Ginsberg. She is disrespecting the grqce, the stype, the intelligence of the office with her rude style, her ignorance of the case and her ego maniacle style

_ Knowledge is at the core of our Justices–the transcripts will show Judge Irizarry ha no knowledge of this case

Wisdom is at the core of the justice– the transcripts will show Judge Irizarry is familiar with many things buy not with wisdom. She refused to understand the information in the letters written by Litwok's doctors. She wanted to force them into her court room hoping to intimidate them instead. The letters were clear. She asked Litwok, would you prefer, I have the marshals get your doctors here?. Clearly this shows no wisdom, just a bully with some power.

Judge Irizarry ruled against Litwok on every decision. Judge Irizarry didn't asked Litwok how long she needed for trail , only the SEC. Judge irizarry forget Litwok was Pro Ce, or perhaps she remembered.

The Court should not automatically reject this case because it is against a sitting Judge. This is a controversial sitting Judge. This Judge should not have been appointed and should not stay appointed. A reading of the minutes in this case only should be of concern.

Ten states put up ballots for term limits on Judges because of Judges like Judge Irizarry. More states will do this in 2008. If there is no self regulation, the voters will take care of the Judges too.

The Police Department of New York is on the line every day and they face their responsibilities every day. Within hours of a shooting, there is an investigation. It had been 8 years since Litwok's attorneys wrote letters to the enforcement divisions of the SEC and the U.S. Attorney's office and still "no response". This would not be acceptable behavior for a New York Coty Police Department. The standards we have for different levels of government is exactly what is at issue in America today.

This complaint is a reflection of not only Litwok's frustration with a system intent on violating her civil rights, but the "institutionalization" of regulatory agencies who has stopped self regulating and allow government employees to violate the Constitution of the United States. It is not an unfamiliar theme in this day and age. After 9 years, Litwok is tired, frustrated and has had enough of watching government employees trampled on her civil rights.

Congressman, senators and governors are elected. They can be voted in and out. Federal employees like the postal inspectors, the IRS agents, SEC attorneys, U.S. Attorney's and the Federal Judges are tenured for life. This is a very dangerous "state" if these staff are left unregulated and "unsupervised". It provides for too much power and too many opportunities for corrupt behavior. The enforcement or "self" regulating system currently in existence is not working. There was no response to complaints made to either enforcement/administrative divisions of either the SEC or the U.S. Attorney's offices from Litwok's attorneys dating back to 1998.

The situation described in this complaint is not unique. Ten ballots in the 2006 election demanding tem limits for Judges reflect a growing frustration with a system refusing to regulate itself. The problem is not that every attorney working for the SEC is like a Matthews or a Markowitz or that every Postal Inspector Service has a Sol Farash, or that every Federal bench has a Judge bent on screaming like Irizarry, but the sum total of these people and their behavior have pushed Litwok and others to the edge.

The violation of the Constitution and due process will be tested here and with others in the coming years. The system will either purge itself willingly of

its bad attorney's, employees, Judge and begin to police itself, or it will begin to be policed by the outside world.

Since Congress and the Senate could not vote on the issue of border security, little towns on the border on voting to change laws to protect their towns. In this same fashion, the SEC, the U.S. Attorneys, the Judiciary will be faced with limits set by individual townships or they will look into cases like Litwok's and begin to see the "horror" of the what unsupervised power in the hands of some people looks like.

While this complaint is not well written and does not fully describe each and every instance of what happened, it does provide the tone of the disregard for due process and civil rights by some government employees.

In this year's election, the country opted "to sweep out" the old because the rhetoric was too much for too long. The institutional "crime" operating in the offices of the Northeast Region of the SEC, the U.S. Attorney's Office, the IRS, the Postal Inspector Service, all in the Eastern District, all needs to be swept out of office.

Government attorneys and staff were permitted to trampled on Litwok's basic rights under the Constitution. It is doubtful Litwok is the only one to suffer at the hands of those in the Eastern district of these offices.

Though it appears Judge Irizarry is "untouchable", it is remarkable, that the court system in New York would permit her to remain a sitting Judge. Just a mention of her name brings the same consistent reaction. She is wildly temperamental, unable and unwilling to control her moods and everyone knows this.

Personally, a Judgeship is something to be honored. In the hands of Judge Irizarry it is not elegant, it is an embarrassment. There is no excuse for the professional community to let this farce keep going. A judgeship should not be a pay back for a political favor, particularly in the hands of someone who is remarkably irrational.

For the Eastern District of New York, the proper investigation must be done and attorneys and staff should be fired, not transferred. This would mark the first time, the system doesn't cover up its problem, but chooses to deal with it properly. If it doesn't deal with it properly, it will only be a matter of time before the voters will have a say and the "district" will lose the freedom they once enjoyed because of a corrupt few.

For some, these "untouchables", they have created a "fiefdom", where they have forgotten the rule of law. After nine years of frustration of hearing them lie over and over, it is enough.

They have damaged my business, my fund, my life, my liberty, my freedom, and my health.

********************************************************************

DAMAGES

Litwok is seeking damages as a result of the violation of her due process of the violation of her Constitutional rights. She is seeking damages from each source not limited but including the government employees at the Northeast region of the SEC, the IRS agents, the government Postal Inspector Sol Farash, the U S Attorney staff working on the insurance and tax case, the damages resulting from Litwok's loss of her income from the last 9 years, loss of income going forward, damages from government interference into the Republic case, the loss of the Republic case, these damages will also served on Peter Haveles and Cadwalader, Haversham & Tat, and Len Lesser and Schneck , Weltman & Hashmall. Damages will also be assessed from Peter Testaverde, Goldstein Golub Kessler, American Express, Corey Winograd, Sydney and Vera Berkowitz and Barry Berkowitz and .

The non governmental parties participating and are participants in this on going 9 years case.

Litwok will be seeking damages of 1 billion dollars and seeking RICO damages from the government employees.

se lawyers who are tenured with no accountability . Unlike the Mark Foley's of the world, re not kicked out. They are more dangerous than elected officials because no one is ing them

Evie Litwok

# EXHIBIT LIST

| | | |
|---|---|---|
| 1 | Twomey letter | 12/11/97 |
| 2. | O'Shea letter | 3/31 98 |
| 3. | Andrew Geist | 4/1/98 |
| 4. | O'Shea | 4/20/98 |
| 5. | Miachael Macco | 4/2/98 |
| 6. | Medical Disability | 2005/06 |
| 7. | Eilat transfers of money | 1995 |
| 8. | Eilat transfer $100,000 | 5/9/95 |
| 9. | Eilat tax returns | 1993/94 |
| 10. | Eilat tax liens | 1990's |
| 11. | Kohn LP-33 | 1996 |
| 12. | Sarah Kane Deposition | |
| 13. | March agreement | 3/1997 |
| 14. | Moore Deposition | 1998 |
| 15. | SEC complaint | 12/27/00 |
| 16. | East Hampton Homes for sale | 5/19/97 |
| 17. | Appraisals | 5/1/97 |
| 18. | Arbitration - 17th session | 10/30/97 |
| 19. | Eilat hiring Insurance Adjusters | |
| 20. | Chubb correspondence | 1997 |
| 21. | Twomey lawsuit | 6/97 |
| 22. | Eilat answer | |
| 23. | Lagot-Thailand | 10/97 |
| 24. | EL attempt to get tape | 12/1/97 |
| 25. | Expert report | |
| 26. | Smalley -NYSE | 11/25/97 |
| 27. | Smalley-NYSE-David Carey | 12/1/97 |
| 28. | David Carey letter/NYSE | |
| 29. | Smalley | 1/19/98 |
| 30. | Smalley | 1/22/98 |
| 31. | DeAngelo | 1/27/98 |

| | | |
|---|---|---|
| 32. | DeAngelo Deposition | 5/30/04 |
| 33. | SGI | |
| 34. | Pat Colgan | |
| 35. | Minutes Judges Lindsay | 12/16/04 |
| 36. | SEC closes Republic | 12/17/ 01 |
| 37. | Harrassment case | 5/19/97 |
| 37A | Eilat tax returns | 1995,1996,1997 |
| 38. | Sol Farash Arrest | 12/4/97 |
| 39. | Eilat to Farash | 3/19/99 |
| 40. | Eilat to Chubb | 6/18/97 |
| 41. | Eilat to Chubb | 1997 |
| 42. | Eilat to U.S.Attorney/ Chubb | 10/20/97 |
| 43. | Permission to deposit checks | 2/20/97 |
| 44. | Farash permission | 12/8/97 |
| 45. | Patio furniture( original purchase) | 2/1995 |
| 46. | Bob White | 10/11/95 |
| 47. | DE takes documents | 8/1/97 |
| 48. | Cooperation Agreement | |
| 49. | Minutes judge Lindsay | 11/ 23/04 |
| 50. | | |
| 51. | Testaverde depo | 1998 |
| 52. | Markowitz - 3 letters | |
| 53. | Litwok attorney | 5/4/98 |
| 54. | SEC | 6/4/1998 |
| 55. | Litwok attorney | 7/98 |
| 56. | Settlement talks | 11/20/01 |
| 57. | Testaverde deposition | 4/2003 |
| 58. | Testaverde depo | 1998 |
| 59. | Testaverde depo | 1998 |
| 60. | Testaverde | 8/19/96 |
| 61. | Retainer agreements | 1/16/96 |
| 62. | Testaverde | 9/21/95 |
| 63. | Documents required 3 weeks before Compillation/ & missing information After production of compilation | 10/4/95 & 1/24/96 |

| | | |
|---|---|---|
| 63A. | | |
| 64. | Lesser to Testaverde | 8/16/96 |
| 65. | Berkowitz $167,000 | 11/16/95 |
| 66. | Barry Berkowitz | 6/27/00 |
| 67. | SEC memorandum | 1/29/2003 |
| 67A. | | |
| 68. | Sarna withdrawal | 4/14/03 |
| 69. | Eilat licenses | 4/23/03 |
| 70. | Fenwick Keats | 4/16/03 |
| | Eilat Bankruptcy | 4/24/03 |
| 71. | Sapone- faxes- depositions | 2003/2004 |
| 71A. | Sapone deposition schedule | |
| 71B. | Sapone resignation | 8/4/04 |
| 72. | Litwok parents | |
| 73. | Matthews | 9/22/06 |
| 74. | Gottlieb | 4/29/03 |
| 75. | Davis | 4/23/03 |
| 76. | Recusal & Complaint to Judicial Council/Second Circuit | 8/25/06 |
| 77. | American Bar Association | 10/1/2003 |
| 78. | Irizarry Minutes | 2/23 & 3/1/06 |